GERALD BRACE, IN HIS OWN RIGHT, *etc.*

*v.*

SALEM COLD STORAGE, *Inc.*

(No. 12036)

Submitted January 24, 1961.   Decided March 7, 1961.

*Tom T. Baker, Robert L. Slack,* for plaintiffs in error.

*H. L. Ducker, A. M. Foose,* for defendant in error.

CALHOUN, JUDGE:

This action of trespass on the case was instituted in the Circuit Court of Cabell County by Gerald Brace, in his own right and as next friend for his brother, Robert Brace, an infant, against Salem Cold Storage, Inc. The two individuals named above will be referred to herein as plaintiffs and Salem Cold Storage, Inc., will be referred to as the defendant.

The purpose of the action is to recover for damage caused to cabbage belonging to the plaintiffs by the alleged failure of the defendant to maintain a proper temperature in its cold storage warehouse in which the cabbage was stored.

The trial of the case before a jury under a plea of the general issue resulted in a verdict for $6,000, returned in favor of the plaintiffs on July 1, 1959. The order by which the verdict was recorded recites that the defendant made a timely motion to set aside the verdict and award the defendant a new trial on the ground that the verdict is contrary to the law and the evidence, and upon "other grounds" to be assigned subsequently at the bar of the court. Argument on the motion was set for July 24, 1959. On November 13, 1959, the court entered an order reciting that the motion was previously made to set aside the verdict "as

being contrary to the law and the evidence, and for other causes assigned at the Bar * * * which motion was argued by counsel by briefs filed with the Court on behalf of both parties, of which the Court took time to consider." Such "other grounds" or such "other causes", if urged or assigned in support of the motion, are not made a part of the record. By the order entered on November 13, 1959, the court set aside the verdict and granted the defendant a new trial. The record fails to disclose upon what ground or grounds the court based its action in sustaining the defendant's motion. To the action of the court in setting aside the verdict and granting a new trial, the plaintiffs prosecute this writ of error.

While various propositions have been urged in behalf of the parties, respectively, by briefs and by oral argument before this Court, all matters thus urged relate to the action of the trial court in setting aside the verdict and awarding a new trial, the defendant asserting that such action was proper, and the plaintiffs asserting that such action was improper. In other words, perhaps it is accurate to say that the single question presented for decision is whether the verdict is or is not contrary to the law and the evidence.

During 1958 the plaintiffs grew cabbage on one hundred acres of land which they rented near Waterford, Pennsylvania. It was stipulated that 7,315 bags of cabbage thus grown were placed in storage in the defendant's cold storage warehouse at Huntington, West Virginia, during the period from October 27 to November 13. The testimony discloses that Waterford, Pennsylvania, is approximately 350 miles from Huntington, West Virginia, and that about eighteen hours were required to harvest a truck or trailer load of cabbage and get it in storage at the defendant's warehouse. Transportation alone required approximately twelve hours, while the harvesting and loading required five or six hours. The plaintiffs, by their own testimony and by the testimony of other witnesses, established that the cabbage was sound and of good quality

when harvested and when stored. There was no testimony from which the jury would have been warranted in finding otherwise. Theodore Joseph Salem, who is also referred to in the testimony as "Ted" Salem, one of the owners of the defendant corporation, testified that apparently the cabbage was in good condition when stored; and that no objection was made on behalf of the defendant concerning the condition of the cabbage when it was delivered to the warehouse for storage. As the cabbage was placed in the warehouse from time to time, the defendant issued and delivered to the plaintiffs receipts containing the following language: "Contents in apparent good order." The cabbage was referred to in the testimony as a "Danish type". The testimony discloses that this is a variety of cabbage peculiarly suitable for winter use and winter storage. D. B. Kilmer, a fruit and vegetable inspector for the United States Department of Agriculture for the previous fourteen years, testified that "The agriculture statistics show that Danish type should last three or four months" in cold storage and that "from all department of agriculture research they claim 32 degrees is the best temperature to hold cabbage for storage." When the cabbage was delivered to the warehouse, it was placed for storage and the bags were stacked by the defendant's employees.

A diagram or plat showing the floor plan of the warehouse designates the three rooms in which the cabbage was stored as 1, 2, and 3. Ted Salem testified that the first cabbage stored was placed in room number one. Gerald Brace testified that the cabbage in room number one "which was kept at approximately the right temperature, kept fairly well." It was stipulated that the cabbage contained in 2,500 bags stored in room number one was delivered to and received by the plaintiffs in good condition. The controversy relates only to the cabbage contained in the remaining 4,815 bags, weighing approximately 50 pounds each, which were stored in rooms number two and number three.

About two weeks prior to the date the first cabbage was stored, Gerald Brace came to the defendant's place of business, and made preliminary arrangements for storing cabbage at the rate of ten cents a bag per month. Such arrangements apparently were made with Ted Salem. He testified that when the preliminary arrangements were being made, he told Gerald Brace that the temperature "would be 32 to 34". Gerald Brace testified that in connection with the making of the oral arrangement, "we told them to keep the temperature between 32 and 34." Theodore Joseph Salem testified that in rooms number one and number two, the air is cooled by a coil system, with a thermostat in each of such two rooms set at 32 to 34 degrees, operating automatically, and that, if the temperature rises above 34 degrees, the cooling system should "kick on" automatically. Temperature in room number three is maintained by a "blower system", by which air is blown in from rooms having the coil system. Gerald Brace testified that the first time he went inside the warehouse after the cabbage was stored therein, the temperature was "right around 37 or 38 degrees"; that on one occasion the temperature was "up to 40" in room number three; that he advised the defendant's agents to check the thermostat (apparently in room number two) ; and that in that connection he had a conversation with Ted Salem as follows:

"Q. And upon discovering that the temperature was too high what did you do about it?

"A. I went out and—well, I talked to Ted Salem a couple of times on it.

\* \* \*

"Q. And what did you tell Mr. Salem?

"A. I told him that the temperature was too high in there. The same as I told the other fellow that worked down there. I can't recall his name. That they should have the thermostat checked and see that it was working properly.

"Q. And what was his reply?

\* \* \*

"A.   Ted Salem also said that if it wasn't cold enough in there, if I ever went in there, to take and put a piece of paper behind the thermostat.

"Q.   What did you tell Mr. Salem?

"A.   I told Mr. Salem that I didn't want to have anything to do with it, it wasn't up to me to take care of that part. I told him that I would like to have him have it checked.

"Q.   Was this defect corrected, to your knowledge?

"A.   No.

"Q.   On how many different occasions did you complain to Mr. Salem or the defendant about this condition?

"A.   Four or five.

"Q.   And did he tell you the same thing on each occasion?

"A.   Yes.

"Q.   As a result of the temperature being too warm what change in the condition, if any, did you observe in the room? And especially with relation to condensation, if any?

"A.   Well, cabbage will draw heat, now. And with the temperature up as high as it was, it was forming condensation at the top of the ceiling, which of course leaked down on to the cabbage, which caused the mold and also made it rot.

"Q.   How great was this condensation or this water that was running off the walls on to the cabbage?

"A.   Well, there was an awful lot of water dripping, I know that."

Robert Brace gave the following testimony?

"Q.   What was the condition of the cabbage on December 15th when you made demand for its return?

"A.   In room 3 it was terrible. The water had dripped all over the top, and all the top bags were rotted and floating away, and it was really terrible. Room 2, it had started to mold real bad too. The leaves had all turned on it. And the water barrels were over-

flowing. And they didn't take care of those. They didn't empty them every day like they should have. Room 1 was not too bad. It was in pretty good shape."

D. B. Kilmer, fruit and vegetable inspector for the United States Department of Agriculture, inspected the cabbage on January 6, 1959, in response to a request made by the plaintiffs. He testified that at that time he inspected 600 representative bags of cabbage; that the cabbage "averaged approximately 75 percent decayed. * * * 75 percent had gray mold on it;" that in room number three the temperature "was 39 at the top and 37 at the bottom" of the stacks of cabbage and that in room two "the temperature was 37 at the top and 35 at the bottom." Ted Salem admitted in his testimony that Gerald Brace complained that the temperature was too high and that he put paper behind the thermostat in order to "satisfy Brace" and that a "piece of paper locks the thermostat."

Gerald Brace testified that when demand was made for redelivery of the cabbage on or about December 15, it was "unsalable" or "unmarketable". The plaintiffs on or about December 27, with a crew of five or six men, started cleaning the cabbage in an effort to salvage it by discarding decayed or spoiled outer leaves. The plaintiffs incurred a labor bill of $703.10 in such cleaning or salvage efforts. Some of such salvaged cabbage was sold locally and some was shipped to Pittsburgh, Pennsylvania, and to Cincinnati and Columbus, Ohio, but, according to the testimony of Gerald Brace, the labor and transportation costs exceeded the aggregate purchase price received for the cabbage.

The principal witnesses in behalf of the defendant were Theodore Joseph Salem, Fred J. Salem and Louis J. Salem. They apparently did not deny that the cabbage was damaged or that the temperature in rooms numbers two and three rose above the range of 32 to 34 degrees, but they took the position that this excessive temperature was caused by the spoiled, discarded cabbage leaves piled on the floor of the warehouse in

connection with the salvage work, and by the body temperature of the men who were engaged in such work. The plaintiffs, on the other hand, insist that the excessive temperature and the consequent spoilage of cabbage had occurred prior to December 27, the date the salvage efforts were commenced; and that, in any event, if the refrigeration devices had been working properly, the temperature would have been reduced automatically to a proper level.

Gerald Brace testified that at the time demand was made of defendant for redelivery on December 15, the market value of cabbage at Huntington was approximately $1.75 per fifty-pound bag. W. D. Click testified that, as "Farmer Click", he was a farm expert for WSAZ radio and television and that previously he had been a county agriculture agent. He testified that on December 15, 1958, the wholesale market value of cabbage at Huntington was from $1.50 to $1.75 per fifty-pound bag.

Counsel for the defendant in their brief do not make any assignments of error relating specifically to the action of the court in granting or refusing instructions, or to the action of the court in ruling upon the admissibility of evidence. The five propositions relied on in such brief relate to the burden of proof, or the burden of going forward with the evidence, and to the alleged insufficiency of the evidence to sustain the verdict in favor of the plaintiffs.

" 'Warehouseman' means a person lawfully engaged in the business of storing goods for profit." Code 1931, 47-5-58. The liability of a warehouseman for negligence is stated in Code, 1931, 47-5-21, as follows: "A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care." Statutes of this

nature are merely declaratory of the common law. 93 C.J.S., Farehousemen & Safe Depositaries, Section 30, page 450; *John Nix & Co. v. Herbert,* 149 Va. 131, 140 S. E. 121, 55 A.L.R. 1098; 3 Uniform Laws Ann. 79. The relationship between a warehouseman and the owner of goods stored with him is usually that of bailor and bailee for hire. 93 C.J.S., Warehousemen & Safe Depositaries, Section 12b, page 407. "It is well settled that when goods are stored in a warehouse, the relation of bailor and bailee, with its correlative rights and duties, is created between the depositor or owner of the goods and the warehouseman. The warehouseman is a bailee for hire." 56 Am. Jur., Warehouses, Section 21, page 331. See also *Brown Shoe Co. v. Hardin,* 77 W. Va. 611, 616, 87 S. E. 1014, 1016, L.R.A. 1916D 1199.

The case of *Prettyman v. Hopkins Motor Co.,* 139 W. Va. 711, 81 S. E. 2d 78, involved an action of assumpsit to recover for loss by fire of an automobile placed by the plaintiff in the defendant's garage to be repaired and painted. The relationship thereby created was treated as a bailment for hire. The Court adhered to that which is characterized as the "modern rule" that when chattels are delivered to a bailee for hire in good condition and are returned in a damaged state, or when, upon demand, such chattels are not returned, the law presumes the bailee's negligence or other fault to be the cause and casts on the bailee the burden of showing that the loss was due to other causes consistent with due care on his part; and, if the bailee does not sustain such burden, the bailor becomes entitled as a matter of law to a verdict in his favor. The Court pointed out that though the overall or ultimate burden of proof does not shift in such a case, the bailor may make a *prima facie* case of negligence sufficient to shift to the bailee the burden of going forward with the evidence. See also *Revenue Aero Club, Inc. v. Alexandria Airport, Inc.,* 192 Va. 231, 64 S. E. 2d 671; 71 A.L.R. 768. The legal principles stated in *Prettyman v. Hopkins Motor Co., supra,* apply in a

similar manner to the relationship existing between a warehouseman and an owner of chattels placed in the warehouse for storage. 93 C.J.S., Warehousemen & Safe Depositaries, Section 76, pages 515 *et seq.;* 56 Am. Jur., Warehouses, Section 263, page 438; 19 M.J., Warehouses and Warehousemen, Section 6, page 545. The same general legal principles relate to cold storage warehouses. 56 Am. Jur., Warehouses, Section 274, page 445.

The nature and extent of the liability of a cold storage warehouseman are stated in 93 C.J.S., Warehousemen & Depositaries, Section 43b, pages 467-468, as follows:

> "While a cold storer is not an insurer of perishable goods committed to his care, yet, by reason of the peculiar nature of the enterprise in which he is engaged, he stands on a different footing from that occupied by the ordinary warehouseman, and is under a duty to employ the skill and expert knowledge requisite to his calling. In other words, while a cold storer is bound to exercise ordinary or reasonable care, and may escape liability where he has exercised such care, in determining what constitutes reasonable care for a cold storer the courts will take into consideration the nature of his occupation and the character of the contract. Where a cold storage warehouseman contracts to keep the room in which goods are stored at a certain temperature, he is liable for any damage resulting from his failure to maintain such temperature; where no particular temperature is stipulated for, he should maintain the ordinary cold storage room temperature, or that temperature which is proper for the preservation of goods of the character of those received, and he is responsible not only for the maintenance of the proper temperature but also for its even distribution.

> "It has also been held that an operator of a public cold storage warehouse, in absence of a contract limiting liability, is obligated to perform faithfully the duties of a public warehouseman, including the duty properly to exercise that degree of care in safekeeping of goods intrusted to him which a reasonably careful man would exercise with respect to similar goods of his own. A cold storage warehouseman is

obligated to deliver to the bailor perishable goods in as good a condition as is shown by the warehouse certificate less natural deterioration."

To the same effect see 56 Am. Jur., Warehouses, Section 138, pages 385-386, and Section 132, pages 382-383. In the case of *John Nix & Co. v. Herbert*, 149 Va. 131, 135, 140 S. E. 121, 123, 55 A.L.R. 1098, involving an action to recover for damage resulting to apples while in a cold storage warehouse, the Court stated general principles relating to a *prima facie* case, the burden of going forward with the evidence, and the burden of proof; and defined the nature of the cold storage warehouseman's duty as follows:

"While a cold storer is in no sense an insurer of the perishable goods committed to his care, and is only liable for a breach of the statutory duty imposed upon him, yet, by reason of the peculiar nature of the enterprise in which he is engaged, he stands upon a different footing from that occupied by the ordinary warehouseman.

"Refrigeration is a mechanical process of comparatively recent origin and requires experience and skill. One who places his goods in cold storage necessarily relies upon the expert knowledge of the cold storer. The charge for keeping perishable products in cold storage is much higher than that made for the storage of nonperishable goods.

"One who commits his apples to a cold storer has the right to expect—not preservation, for that is impossible beyond a certain period—but a prevention of decay for a reasonable period, depending upon the circumstances of each particular case. Without this expectation the storage of perishable products would be but a venture."

Principles pertaining to burden of proof and related questions are stated in 56 Am. Jur., Section 274, pages 445-446, as follows: ''The general rule is that where goods in cold storage are damaged, the burden of proof of negligence of the warehouseman rests on the depositor or owner of the goods. The depositor or owner is not necessarily required, however, to show specific acts of negligence causing the damage. It is generally

held that where the owner shows that the goods were in good condition at the time they were delivered to the cold-storage warehouse, and that they were returned in a damaged condition from a cause not inherent in the goods themselves, the owner has made out a prima facie case, and it is incumbent on the warehouseman to account for the injury to the goods in some manner consistent with the exercise of due care on his part, unless the damage is of such nature as to result from natural causes, or deterioration, or internal defects without fault on the part of the warehouseman. If the evidence of the warehouseman gives an explanation of the injury which is consistent with reasonable care on his part, the bailor must show positive negligence on the part of the cold-storage operator. A statute requiring only the exercise of due care by a cold storer is not conclusive upon the question of burden of proof, where perishable goods have been injured while in cold storage.'' See also 3 Uniform Laws Ann., pages 109-17.

The defendant, even in the absence of an express contract to maintain a specified temperature, was under a duty to maintain a proper temperature for the preservation of goods of the type received by it for storage. The defendant was not an insurer of the cabbage stored in its cold storage warehouse, but was required to exercise only ordinary care. It was, nevertheless, required to employ the skill and peculiar knowledge requisite to the operation of the business in which it was engaged. In order to recover in this action, it was incumbent upon the plaintiffs to establish negligence on the part of the defendant, and that such negligence caused the damage to the cabbage. In a case such as this, if the owner of the goods proves that the goods when placed in the cold storage warehouse were in good condition and that, when demanded within a reasonable time, they were in a damaged condition, there may be cast upon the defendant warehouseman thereby a burden of going forward with the evidence, in accordance with princi-

ples previously stated herein; but the ultimate burden of proof remains upon the plaintiff throughout the trial to establish his case by a preponderance of the evidence. The general principles stated herein have been applied in court decisions dealing with various types of perishable goods. *Henderson Min. & Mfg. Co. v. Cimini,* 185 Ky. 85, 213 S. W. 923 (apples); *Crystal Ice & Storage Co. v. Renschler,* 99 Cal. App. 417, 278 P. 874 (apples); *Southern Ice & Utilities Co. v. Stewart* (Tex.), 15 S. W. 2d 132 (eggs); *City of Dallas v. Milum* (Tex.), 200 S. W. 2d 833 (eggs); *Greenwich Warehouse Co. v. Maxfield,* 28 N.Y.S. 732 (mandarins and tangerines); *Scott's Valley Fruit Exchange v. Growers Refrigeration Co.* (Cal.), 184 P. 2d 183 (pears); *Sutherland et al. v. Albany Cold Storage,* 171 N. Y. 269, 63 N.E. 1100, Anno. 55 A.L.R. 1103 (eggs); *John Nix & Co. v. Herbert,* 149 Va. 131, 140 S. E. 121 (apples); *Holt Ice & Cold-Storage Co. v. Arthur Jordan Co.,* 25 Ind. App. 314, 57 N.E. 575 (butter); *Noel & Co. v. Schuur,* 140 Tenn. 245, 204 S. W. 632 (celery); *Lee v. Midwest Cold Storage & Ice Corp.,* 155 Kan. 876, 130 P. 2d 574 (hides); *C. & O. Ry. Co. v. Crenshaw & Co.,* 147 Va. 290, 137 S. E. 515 (grapes); *C. & O. Ry. Co. v. Crenshaw & Co.,* 148 Va. 48, 138 S. E. 467 (honeydew melons).

Counsel for the defendant take the position that since the plaintiffs elected to sue in tort rather than in assumpsit, the burden was upon the plaintiffs initally to prove negligence on the part of the defendant, and that under such circumstances a *prima facie* case for recovery could not be established by a mere showing that the goods were in good condition when stored and in damaged condition when demand was made for their return. Such distinction is recognized by some decisions. *Traders Compress Co. v. Precure,* 140 Okla. 40, 282 P. 165, 71 A.L.R. 759; 93 C.J.S., Warehousemen & Safe Depositaries, Section 76(b), page 519. We do not deem it necessary to decide this question because, whether required to do so or not, the plaintiffs, as part of their case in chief, introduced their testimony bear-

ing on the negligence of the defendant. *H. C. Powell Music Co. v. Parkersburg Transfer & Storage Co.,* 75 W. Va. 659, 664, 84 S. E. 563, 565. As a matter of fact, no rebuttal testimony was introduced on behalf of the plaintiffs. By defendant's instruction number three and plaintiffs' instruction number five, the jury was instructed that the plaintiffs were required to maintain the overall or ultimate burden of proving their case by a preponderance of the evidence.

"When the evidence is conflicting, or when the facts, though undisputed, are such that reasonable men may draw different conclusions from them, the question of negligence is for the jury." *Prettyman v. Hopkins Motor Co.,* 139 W. Va. 711, pt. 2 syl., 81 S. E. 2d 78. See also 93 C.J.S., Warehousemen & Safe Depositaries, Section 79b, page 531; Anno. 55 A.L.R. 1103. "As in other cases, the question whether the damage to or loss of perishable property in a cold-storage warehouse is due to the negligence of the warehouseman is one for determination by the jury, where there is substantial evidence on which to submit such issue." 56 Am. Jur., Warehouses, Section 253, page 435. See also *Van Nostern v. Richey & Gilbert Co.,* 2 Wash. 2d 663, 99 P. 2d 608; *Purse v. Detroit Harbor Terminals, Inc.,* 266 Mich. 92, 253 N.W. 228; *Sadoian v. Modesto Refrigerating Co.,* 157 Cal. App. 2d 266, 320 P. 2d 583; *Roberts v. General Cold Storage Co.,* 120 Pa. Super. 508, 183 A. 71; *Russell v. Empire Storage & Ice Co.,* 332 Mo. 707, 59 S. W. 2d 1061; *Worthy v. Arctic Co.,* 114 Wash. 435, 195 P. 222; *Minnesota Butter & Cheese Co. v. St. Paul Cold-Storage Warehouse Co.,* 75 Minn. 445, 77 N.W. 977, 74 Am. St. Rep. 515; *Scott's Valley Fruit Exchange v. Growers Refrigeration Co.,* 81 Cal. App. 2d 437, 184 P. 2d 183. "The action of the trial court in setting aside a verdict for the plaintiff and awarding the defendant a new trial will be reversed by this Court where it appears that the case, as a whole, was fairly tried and no error prejudicial to the defendant was committed therein." *Earl T. Browder, Inc. v. County Court of Webster County,* 145 W.

Va. 696 pt. 7 syl., 116 S. E. 2d 867. "Where the verdict of a jury has been improperly set aside by the trial court, this Court will reinstate the verdict and render judgment thereon." *Ware v. Hays,* 119 W. Va. 585, pt. 3 syl., 195 S. E. 265. See also Code, 58-5-25; *Earl T. Browder, Inc. v. County Court of Webster County,* 145 W. Va. 696, 116 S. E. 2d 867; *City of McMechen v. Fidelity and Casualty Co.,* 145 W. Va. 660, 116 S. E. 2d 388; *Ward v. Raleigh County Park Board,* 143 W. Va. 931, 105 S. E. 2d 881.

Bearing in mind the fact that W. D. Click testified that the wholesale market value of cabbage at Huntington on December 15, 1958, was from $1.50 to $1.75 per fifty-pound bag, we observe that the aggregate market value of 4,815 bags at $1.50 each would be $7,222.50, and at $1.75 per bag the aggregate market value would be $8,426.25. It can not be said, therefore, that the verdict of $6,000 is excessive. Considering the fact that D. B. Kilmer, fruit and vegetable inspector for the United States Department of Agriculture, testified that the "Danish type" cabbage, when placed in cold storage in good condition and at a proper temperature, should keep for three or four months, we observe that three months from the time the cabbage was placed in storage (October 27, to November 13) would be January 27, 1959, to February 13, 1959, and four months would be February 27 to March 13, 1959. These facts were proper for consideration by the jury in connection with testimony of Gerald Brace that the cabbage was "unsalable" or "unmarketable" on December 15, and the testimony of D. B. Kilmer concerning the condition of the cabbage when he made his inspection on January 6, 1959. The jury would have been warranted in attaching significance to the fact that the cabbage remained in good condition in room number one and spoiled in the other two rooms. The jury would have been warranted in considering the testimony of Gerald Brace and D. B. Kilmer concerning temperature ranging from 37 to 40 degrees in room number two and in room number

three, in the light of the undisputed testimony that temperature in the warehouse is controlled automatically by thermostats. A fair inference from such testimony is that the automatic refrigeration devices in the warehouse were not operating properly, and that the defendant's agents and employees should have given greater heed to complaints admittedly made by Gerald Brace concerning excessive temperature. On the whole case, we feel that the facts bearing both upon the right to recover and upon the amount of the verdict were peculiarly for jury determination; and that the trial court would not have been warranted in setting aside the verdict on the ground of insufficiency of evidence to support such verdict.

For the reasons stated herein, the judgment of the Circuit Court of Cabell County is reversed, the verdict of the jury is reinstated, and judgment for the plaintiffs on such verdict is rendered in this Court.

*Judgment reversed;*
*verdict for plaintiffs reinstated;*
*judgment rendered by this Court.*