**F-M POTATOES, INC., Plaintiff and Appellant,**

v.

**Paul SUDA, Defendant and Appellee.**

**Civ. No. 9366.**

Supreme Court of North Dakota.

Oct. 26, 1977.

Burke, Hodny & Burke, Grafton, for plaintiff and appellant; argued by John F. Burke, Grafton.

Dahl, Dahl & Greenagel, Grafton, for defendant and appellee; argued by Robert E. Dahl, Grafton.

PAULSON, Judge.

This is an appeal by the plaintiff, F–M Potatoes, Inc. [hereinafter referred to as F–M], from the judgment of the Walsh County District Court entered on February 17, 1977. F–M brought an action against the defendant, Paul Suda [hereinafter referred to as Suda], asserting that Suda owed F–M $6,500.00 pursuant to an oral contract for "conditioned storage" of 13,000 hundredweight [hereinafter referred to as cwt.] of Kennebec potatoes from October of 1974 through March of 1975. Suda admitted there was an oral contract for the storage of his potatoes, but he denied any financial obligation to F–M for the storage, and he counterclaimed against F–M for damages for F–M's negligent storage of his potatoes, causing their deterioration and rendering them unmarketable.

The case was tried by the court without a jury. The trial court concluded that Suda incurred damages of $20,670.00 as a result of F–M's negligent storage of his potatoes and that F–M was entitled to $6,500.00 for storage charges plus an additional $1,950.00 for removing the unmarketable potatoes from its warehouse. Accordingly, judgment was entered for Suda in the net amount of $12,220.00.

On appeal, F–M requests this court to reverse that part of the judgment granting Suda $20,670.00 damages and to affirm that

part of the judgment granting F–M storage and hauling charges of $8,450.00.

F–M raises the following issues:

(1) Whether the trial court erred when it imposed a presumption of negligence against F–M as the bailee, which shifted to F–M the burden of going forward with the evidence.

(2) Whether there was sufficient evidence to support the trial court's findings that F–M was negligent and that said negligence was the proximate cause of Suda's damages.

(3) Whether the trial court erred when it admitted evidence that Suda marketed potatoes which were harvested from the same field as those stored in the F–M warehouse, but which were stored in Suda's own storage facilities.

(4) Whether the damages awarded to Suda were excessive in view of the evidence submitted at the trial.

The memorandum opinion of the trial court (adopted by the trial court as its findings of fact and conclusions of law, pursuant to Rule 52(a) of the North Dakota Rules of Civil Procedure) provides an excellent summarization of the lengthy and complex facts presented at the trial.

Suda has been a farmer since 1959 and, in 1974, he farmed approximately 1600 acres, of which he planted 425 acres to potatoes and the balance he seeded to small grains. As the 1974 potato harvest progressed it became evident to Suda that the potato storage facilities on his own farm were insufficient and that it would be necessary to obtain additional storage for part of his potato crop. Suda entered into an oral agreement with John Ferguson, the president and principal stockholder of F–M, for the conditioned storage of Suda's potatoes with F–M. The storage agreement, which is not in dispute, provided for a storage rental price of 40¢ per cwt. to February 1, 1975, and an additional 10¢ per cwt. to April 1 of the same year. The agreement further provided that Suda would pay F–M an additional 15¢ per cwt. to have F–M load the potatoes into a truck or railroad car at the time of shipment. Pursuant to the agreement Suda stored 13,000 cwt. of Kennebec potatoes in Bin No. 6 of the F–M warehouse.

The F–M warehouse contains eight bins, each being 28 feet wide, 80 feet long, and 16 feet high. There is a work area which is 30 feet wide and which extends the full length of the warehouse. At one end of each bin is a plenum chamber. In bins numbered 1 through 6, each plenum chamber contains a three horsepower fan, a heater, and humidifying equipment, which are used to condition and prepare the stored potatoes for market. There are triangular air ducts along the bottom side of each bin opening into the plenum chamber; and there is also a flume in the floor extending through the center of each bin. Air can be forced into the ducts and flume through the potato pile where the air is then drawn from the top through a hole leading into the plenum chamber. The roof of the F–M warehouse is pitched, with the peak located over the center of the potato bins. At this peak over each bin is a vent and ventilation fan which can be used either for air intake or for air exhaust to permit proper conditioning of the potatoes. The temperature and ventilation of each bin are controlled by thermostat which can be set manually to obtain the desired temperatures and ventilation.

It is obvious, upon examining the expert testimony and other evidence in the record, that the modern day storage of potatoes is a sophisticated process requiring experience, knowledge, and careful management. A potato passes through three phases while in storage: (1) the wound healing or suberization phase; (2) the dormancy phase; and (3) the respiration or rest phase. The proper combination of temperature, humidity, and ventilation must be utilized for each storage phase to condition the potato for market and to prevent deterioration of the potato. The conditioning capabilities of modern warehouse facilities permit successful storage of potatoes for approximately twelve months.

The Kennebec potato, which is the variety Suda stored with F–M, is sold primarily for processing as potato chips. Processors will only purchase potatoes that deep-fry to an acceptable light color shade of potato chip, based on an industry Potato Chip Color Reference Standard chart, because the lighter colored chip is more appealing to the consumer and requires less grease while it fries. The color to which a potato deep-fries is determined by the proportions of sugar and starch in the potato. During the conditioning process at the warehouse, the proportions of sugar and starch in the potatoes can be controlled to some extent by regulating the temperature. Increasing the pulp temperature of the potato converts the reducing sugars to starch, and, as a result, the potato deep-fries to lighter colored potato chips. This process requires careful storage management and regulation of not only the temperature, but the humidity and the air flow, to prevent deterioration of the potatoes as they are being conditioned for market.

Commencing in December of 1974, and at approximately two-week intervals thereafter, samples of Suda's potatoes from Bin No. 6 of the F–M warehouse were taken to the Frito Lay laboratory for testing. At the laboratory, a slice or two was removed from several of the sample potatoes and deep-fried to determine whether the slices fried to an acceptable potato chip color shade. Suda's potatoes never attained an acceptable potato chip color shade upon frying. Thus, no buyer was found to purchase Suda's potatoes, and during the latter part of March of 1975, F–M hauled Suda's potatoes from its warehouse and disposed of them.

Suda asserted at the trial that the potatoes he stored with F–M deteriorated and failed to obtain a marketable quality as a result of F–M's negligence in failing to provide proper conditioned storage. F–M asserted that Suda's potatoes were never acceptable for marketing because of factors beyond F–M's control such as the inherent high sugar levels in Suda's potatoes, the short growing season coupled with excessive rainfall, and other inherent qualities of the potatoes rendering them susceptible to disease and breakdown.

The trial court concluded that F–M's negligence was the proximate cause of 75% of the loss of Suda's potatoes, but that 25% of the loss was due to causes other than F–M's negligence. Accordingly, the trial court deducted a 25% grade-out factor from the damages awarded to Suda. The trial court also awarded F–M $8,450.00 storage and hauling charges pursuant to the oral contract between Suda and F–M.

Prior to discussing the issues raised by F–M on this appeal, it is necessary to determine whether the legal relationship which existed between Suda and F–M, pursuant to the oral storage agreement, was that of landlord-tenant or that of bailor-bailee. In *Great Plains Supply Co. v. Mobil Oil Company,* 172 N.W.2d 241, 245 (N.D.1969), this court, quoting from 8 Am.Jur.2d, Bailments § 20, p. 926, adopted the following test to determine whether a relationship was one of bailor-bailee or of landlord-tenant:

" ' * * * the test is whether the person leaving the property has made such a delivery to the owner of the premises as to amount to a relinquishment, for a time, of his exclusive possession, control, and dominion over the property, so that the latter can exclude, within the limits of the agreement, the possession of all others. If he has, the general rule is that the transaction is a bailment. If there is no such delivery and relinquishment of exclusive possession, and control and dominion over the goods is dependent in no degree upon the co-operation of the owner of the premises, and access to the goods is in nowise subject to the latter's control, it is generally held that the owner of the goods is a tenant or lessee of the space upon the premises where they are left.' "

In the instant case, F–M agreed to provide conditioned storage for Suda's potatoes and to control all of the mechanical equipment for maintaining the temperature and other conditioning factors. F–M received an additional 30¢ per cwt. for condi-

tioned storage which it would not have received if it had simply rented to Suda unconditioned storage space. The agreement also provided that F–M would load Suda's potatoes on a truck or railroad car at the time of shipment for an additional 15¢ per cwt. Mr. Ferguson, the president and major shareholder of F–M, testified that when potatoes are stored in the F–M warehouse bins, there is a normal procedure that is followed regardless of what instructions are received from the owner of the potatoes. Under these facts, we conclude that the agreement between Suda and F–M created a bailment for hire and that they were in the relationship of bailor-bailee.

F–M asserts on appeal that the district court committed error when it imposed a presumption of negligence against F–M as the bailee, which shifted to F–M the burden of going forward with the evidence. In an action based on negligence, the plaintiff has the burden of persuasion whereby he must prove that the defendant was responsible for some negligent act or omission and that such act or omission was the proximate cause of the plaintiff's injury. In *KcKenzie v. Hanson*, 143 N.W.2d 697 (N.D.1966), this court adopted the modern rule that where the plaintiff proves the existence of a bailment for hire and that the defendant-bailee refused to redeliver the bailed goods, a presumption of negligence arises against the bailee. This rule was also followed in *Lee v. Johnson*, 154 N.W.2d 382 (N.D.1967). Subsequent to the decisions in *McKenzie* and *Johnson, supra,* this court adopted Rule 301(a) of the North Dakota Rules of Evidence, regarding the effect of a presumption in a civil action, which provides as follows:

> "RULE 301—PRESUMPTIONS IN GENERAL IN CIVIL ACTIONS AND PROCEEDINGS
>
> "(a) Effect. In all civil actions and proceedings not otherwise provided for by statute or by these rules, if facts giving rise to a presumption are established by credible evidence, the presumption substitutes for evidence of the existence of the fact presumed until the trier of fact finds from credible evidence that the fact presumed does not exist, in which event the presumption is rebutted and ceases to operate. A party against whom a presumption is directed has the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

■ The bailed goods in the instant case, unlike those in *McKenzie* and *Johnson, supra,* are *perishable* goods which ordinarily deteriorate in the course of time from inherent or natural conditions. We believe that the rule which allows a presumption of negligence to arise against the bailee should only apply when the bailed goods are *nonperishable* and are of such a nature that their loss or damage would not ordinarily occur without negligence. *See Lopeman v. Gee,* 40 Wash.2d 586, 245 P.2d 183 (1952); *Southern Ice & Utilities Co. v. Stewart,* 15 S.W.2d 132, 136 (Tex.Civ.App.1929); *Grady v. Blue Line Transfer & Storage Co.,* 195 Iowa 300, 190 N.W. 375 (1922); *see also* Annot., 92 A.L.R.2d 1298, 1328 (1963).

■ We conclude that in an action by the bailor against the bailee for negligent loss or damage to *perishable* goods, there is no presumption of negligence against the bailee. In such an action, the plaintiff-bailor presents a prima facie case of negligence when he introduces evidence 1) that a bailment for hire exists; 2) that the bailor delivered the property to the bailee; 3) that the property became damaged or was lost; and 4) that the damage or loss was caused by the negligent acts or omissions of the bailee and not by any inherent or natural condition of the bailed property itself.

■ Unless the evidence is such that reasonable minds could come to but one conclusion, the trier-of-fact must weigh the evidence and determine whether the plaintiff-bailor has met the burden of persuasion that the defendant-bailee was negligent and that such negligence was the proximate cause of the damages incurred. Accordingly, we hold that the district court erred when it imposed a presumption of negligence against F–M. In its memorandum opinion, the district court stated:

". . . it is the opinion of this Court that the defendant Suda has not only sustained the burden of establishing delivery of suitable goods for storage and a failure to deliver by the warehouseman but has further established negligence on the part of the warehouseman."

Thus, the district court in its findings concluded that Suda had affirmatively proved negligence on the part of F–M. It was therefore unnecessary for the district court to rely on the presumption of negligence to find in favor of Suda on his counterclaim. We further hold, therefore, that the error of the district court in imposing a presumption of negligence against the bailee was harmless error.

F–M has also raised the issue of whether the evidence was sufficient to support the district court's findings that F–M was negligent and that such negligence was the proximate cause of the loss of Suda's potatoes.

The district court's determination of negligence is a finding of fact which will not be set aside on appeal unless it is clearly erroneous pursuant to Rule 52(a) of the North Dakota Rules of Civil Procedure. *McKechnie v. O'Neil*, 252 N.W.2d 875 (N.D.1977). A finding is "clearly erroneous" only when, although there is some evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Kostelecky v. Kostelecky*, 251 N.W.2d 400 (N.D.1977); *Anderson v. Miller's Fairway Foods*, 225 N.W.2d 579 (N.D. 1975); *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973).

Subsection 1 of § 41–07–10, N.D. C.C., provides the standard of care which a warehouseman must exercise regarding the bailed goods:

"*41–07–10 [U. C. C. 7–204] Duty of care—Contractual limitation of warehouseman's liability.*—1. A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care."

Although a warehouseman is not an insurer of the stored goods, he must exercise the degree of skill and care that a reasonable man would exercise requisite to the operation of the business in which he is engaged. *Brace v. Salem Cold Storage, Inc.*, 146 W.Va. 180, 118 S.E.2d 799 (1961). F–M contracted to provide Suda "conditioned storage" for his potatoes. Modern day conditioned storage of potatoes is a complicated process requiring the proper combinations of temperature, humidity, and ventilation to condition the potatoes for market while at the same time preventing deterioration of the potatoes. F–M was required, therefore, to exercise the degree of skill and care that a reasonable warehouseman would have exercised in providing conditioned storage for potatoes.

The record reflects the following facts which are relevant to the trial court's determination that F–M acted in a negligent manner:

1. In December of 1974, Suda noticed moisture dripping from the overhead vent onto his potatoes in Bin No. 6 of the F–M warehouse, and he brought this fact to the attention of F–M employees. F–M employees attempted to stop the dripping with a styrofoam plug, but this did not correct the problem. Two weeks later Suda inspected his bin again and discovered moisture was still dripping onto his potatoes from the overhead vent. Suda then suggested that F–M install a plywood plug instead of the styrofoam plug. This was done. Edwin Plissey testified on behalf of F–M as a potato expert. He testified, in part, as follows regarding the factors that could cause the breakdown of potatoes in storage:

"And water dripping from the ceiling, if you have free water accumulating on the potatoes and you have these bacterial pathogens or fungal pathogens in excess or if you have damaged areas on those potatoes where this free water accumulates, this becomes the avenue for movement of the spores, the colo-

nies of bacterial fungi which allows it to spread and contaminate other potatoes and causes so-called pockets of rotted potatoes in the, in the bins."

Glen Dahl, an F–M employee, testified that he and other employees of F–M attempted to remove Suda's potatoes which had rotted as a result of the moisture dripping from the vent, but the pocket of rotted potatoes was too large to accomplish the task of removing them. Expert testimony also established that deteriorating potatoes generate a substantial amount of heat.

2. Suda testified that on a couple of occasions he noticed a majority of the plenum chamber doors were left open. Ferguson testified that the plenum chamber doors were supposed to remain closed in order for the fans to build up pressure to push air through the potato pile, and he also admitted that if the plenum chamber doors were left open, heat from adjacent bins could enter Suda's bin.

3. F–M used the work area to store 12,000 to 15,000 cwt. of potatoes. During January these potatoes were shipped from the F–M warehouse. The outside temperature was below freezing during this period and the outside door on the east end of the warehouse was open while the potatoes were being removed from the work area.

4. After the potatoes were removed from the work area, Suda noticed that the insulation was not in place between the planks and the door on the west wall of his bin. Ferguson admitted during his testimony that an opening in a potato bin which was not insulated would result in less effective air circulation.

5. Ferguson testified that several bins of potatoes in the F–M warehouse (i. e., Bin Nos. 3, 4, and 5) began to deteriorate and break down in January and February prior to the breakdown of Suda's bin in March.

6. Suda testified that when the potatoes in Bin No. 5 began to rot and break down, he saw liquid forming in the air flume of Bin No. 5 as a result of the deterioration of the potatoes.

7. Suda placed into storage on his own farm some potatoes which were harvested from the same field as those potatoes which were stored with F–M. These potatoes which were stored on Suda's farm were successfully marketed for potato chip processing.

The trial court concluded from this evidence that F–M had failed to exercise the degree of care in providing conditioned storage for Suda's potatoes that a reasonable warehouseman would have exercised under like circumstances.

 Upon carefully examining the entire record, this court is not left with a definite and firm conviction that the trial court made a mistake when it found that F–M was negligent. There is ample evidence in the record to support the trial court's finding of negligence.

F–M further asserts that the evidence was insufficient to support the district court's finding that F–M's negligence was a proximate cause of the deterioration of Suda's potatoes. We disagree.

To warrant a finding that the negligent act is a proximate cause of the damage, it must appear that the damage complained of was the natural and reasonably foreseeable result of the negligent act, unbroken by any controlling, intervening cause. *Moum v. Maercklein,* 201 N.W.2d 399 (N.D.1972). However, in order for a negligent act to constitute a proximate cause of an injury so as to sustain a recovery it is not necessary that the negligent act be the sole cause of the injury. *Chicago, M., St. P. & P. R. Co. v. Johnston's Fuel Liners,* 122 N.W.2d 140 (N.D.1963); *Leonard v. North Dakota Coop. Wool Market Ass'n,* 72 N.D. 310, 6 N.W.2d 576 (1942); *See also Southern Ice & Utilities Co. v. Stewart,* 15 S.W.2d 132 (Tex. Civ.App.1929); *Townsend v. Rich,* 58 Minn. 559, 60 N.W. 545 (1894).

Expert testimony in the record clearly establishes the fact that improper or fluctuating temperatures, humidity, or ventilation of the potatoes in storage could prevent the potatoes from attaining a marketable condi-

tion and could cause the deterioration and ultimate breakdown of the potatoes in storage. Based upon the facts admitted into evidence (which have been previously enumerated in this opinion), the trial court concluded: that the pocket of rotted potatoes caused by the moisture dripping from the overhead vent had an effect on the pulp temperature and the free circulation of air throughout the entire pile of Suda's potatoes; that the removal of the potatoes from the work area during freezing temperatures, the absence of insulation between the planks and the door of Suda's bin, and the open position of the plenum chamber doors, were all factors interfering with the maintenance of proper temperatures and air circulation of Suda's potatoes; and that the deterioration of the potatoes in Bin Nos. 3, 4, and 5 could have had a deleterious effect on the temperature and air flow in Suda's Bin No. 6. The trial court also considered the fact that potatoes which Suda stored in his own facilities were marketable while those potatoes Suda stored with F–M were not. We conclude there was sufficient evidence upon which the trial court could find that the negligent acts of F–M were a proximate cause of the deterioration and ultimate loss of 75% of the potatoes Suda stored in the F–M warehouse.

Accordingly, we hold that the trial court's findings that F–M acted negligently in providing storage for Suda's potatoes and that such negligence was a proximate cause of 75% of the loss sustained by Suda were not clearly erroneous and will not be set aside on appeal.

█ F–M also asserts on appeal that the trial court erred when it admitted evidence that Suda marketed potatoes which were harvested from the same field as those potatoes stored in the F–M warehouse but which were stored and conditioned in Suda's own facilities on his farm. We hold that the trial court did not commit error when it admitted this evidence. This was relevant evidence for consideration by the trier-of-fact, that the potatoes Suda delivered to the F–M warehouse were of good quality and that the deterioration of the

potatoes Suda had stored in the F–M warehouse was not caused by any inherent or natural condition of the potatoes themselves. *Hawaiian Pineapple Co. v. Eckert Engineering Corp.*, 129 Cal.App.2d 371, 276 P.2d 869 (1954); *Rudell v. Grand Rapids Cold-Storage Co.*, 136 Mich. 528, 99 N.W. 756 (1904).

The final issue raised by F–M on appeal is whether the evidence is sufficient to support the amount of damages awarded to Suda.

Suda introduced into evidence a summary of shipping cards showing various sales of potatoes Suda had made on the open market during March and April of 1975. This evidence showed that Suda received an average price of $2.32 for his potatoes during this period. F–M did not introduce any evidence to refute Suda's evidence of fair market value. The trial court used the $2.32 price as the fair market value which Suda could have received for the potatoes he stored with F–M had they not been damaged by F–M's negligence. The trial court deducted a 25% grade-out from the 13,000 cwt. of potatoes Suda stored with F–M to reflect the loss attributed to causes other than F–M's negligence. The court then multiplied the $2.32 price times 9,750 cwt. of potatoes to obtain a figure of $20,670.00, which represents the total amount of damages attributed to the negligence of F–M. The trial court then deducted from the total award to Suda $6,500.00 for storage charges and $1,950.00 for F–M's hauling of the potatoes from the warehouse pursuant to the oral storage agreement between Suda and F–M. Judgment was entered on behalf of Suda in the net amount of $12,220.00.

█ The trial court's determination as to the amount of damages is a finding of fact which will not be set aside on appeal unless it is clearly erroneous, pursuant to Rule 52(a), N.D.R.Civ.P. *Dobler v. Malloy*, 214 N.W.2d 510 (N.D.1973).

█ The proper measure of damages recoverable from a bailee for negligently causing damage to the bailed goods is the

difference between the fair market value of such goods undamaged by the bailee's negligence and the fair market value of the bailed goods in their damaged condition. *See Lee v. Johnson*, 154 N.W.2d 382 (N.D. 1967); *Keefe v. Bekins Van & Storage Company*, 36 Colo.App. 382, 540 P.2d 1132 (1975); *Lopeman v. Gee*, 40 Wash.2d 586, 245 P.2d 183 (1952); Annot., 32 A.L.R.2d 910 (1953).

■ We conclude that there is sufficient evidence to support the trial court's determination of damages. The trial court properly used the best available evidence in the record to ascertain what the fair market value of Suda's potatoes would have been had they not been damaged by F–M's negligence.[1] In making this determination, the trial court properly deducted an amount (i. e., 25% grade-out) reflecting damage to the potatoes attributed to causes other than F–M's negligence. We hold that the trial court's determination of damages was not clearly erroneous and therefore will not be set aside.

In accordance with this opinion the judgment of the trial court is in all things affirmed.

ERICKSTAD, C. J., and PEDERSEN, VOGEL and SAND, JJ., concur.

---

1. Upon entering the oral storage agreement, Suda and F–M did not set a definite date on which F–M was to load the potatoes for shipment to market. The agreement merely provided that the potatoes were to be shipped from the warehouse as soon as a buyer placed an order to purchase them. It is also unclear in the record on exactly what date it was determined that Suda's potatoes in the F–M warehouse were beyond salvage and would have to be disposed of. The record does reflect, however, that Suda had anticipated the potatoes would be sold late in the season. The trial court used market sales for the period of March and April of 1975 to determine fair market value. Since the time period which the court used to ascertain the fair market value was not raised as an issue on appeal it is not necessary for this court to decide whether or not some other time period would have been more appropriate.