INTERNATIONAL FEED PRODUCTS, INCORPORATED, Plaintiff and Appellee,

v.

ALFALFA PRODUCTS, INCORPORATED, Defendant and Appellant.

INTERNATIONAL FEED PRODUCTS, INCORPORATED, Plaintiff and Appellee,

v.

GRANDIN PELLETING, INCORPORATED, Defendant and Appellant.

INTERNATIONAL FEED PRODUCTS, INCORPORATED, Plaintiff and Appellee,

v.

Leo FROELICH, doing business under the firm name and style of Leo Froelich Feed and Pellet Company, Defendant and Appellant.

Civ. Nos. 10319–10321.

Supreme Court of North Dakota.

Aug. 4, 1983.

Conmy, Feste, Bossart, Hubbard & Corwin, Fargo, for plaintiff and appellee; argued by Charles A. Feste, Fargo.

Dosland, Dosland & Nordhougen, Moorhead, Minn., for defendants and appellants; argued by J.P. Dosland, Moorhead, Minn.

ERICKSTAD, Chief Justice.

These three consolidated appeals are from judgments entered against the defendants, Alfalfa Products, Inc. (Alfalfa), Grandin Pelleting, Inc. (Grandin), and Leo Froelich, doing business as Leo Froelich Feed and Pellet Company (LaMoure), in three breach of contract actions brought by International Feed Products, Incorporated (International Feed), that were consolidated for trial to the Court. We affirm.

Leo Froelich began operating a feed plant at LaMoure, North Dakota, in the early 1960's, in which he bought screenings and processed them into feed products. On April 26, 1973, LaMoure entered into a toll contract with Kurda Mills (Kurda), a subsidiary of W.R. Grace and Company, under which Kurda owned the LaMoure screening inventory, which LaMoure processed into feed for marketing by Kurda. LaMoure received a payment or toll for each ton processed, and, after various deductions and payments were made to Kurda, LaMoure received 80% of any margin remaining and Kurda received 20%. The April 26, 1973, agreement was modified on August 7, 1973, with a new agreement containing a shrinkage provision that was not in the prior agreement.

During 1973, Froelich also obtained control of Alfalfa and Grandin, which operated with Kurda in the same way as LaMoure without written contracts.

In 1974, Kurda decided to terminate the toll agreements. International Feed was then formed to acquire the interests of Kurda, including the inventory located at the LaMoure, Alfalfa, and Grandin plants. Leo Froelich became president and owned one-third of the shares of International Feed. He was also a director of the company until he resigned on May 17, 1976, and was replaced by Harold Pris, who was the manager of the LaMoure plant. Rolland Collison, the former general manager of Kurda, became a stockholder in and general manager of International Feed. The persons who formed International Feed agreed that the arrangements and method of operation between International Feed and the LaMoure, Alfalfa, and Grandin plants were to be the same as had existed between Kurda and the three plants.

International Feed purchased the Kurda inventory at the three plants in November, 1974, and operations began and continued without written contracts until January, 1975, when International Feed and the three plants entered into toll agreements. Leo Froelich signed the toll agreements, which were identical to the previous agreement between Kurda and the LaMoure plant, on behalf of the three plants.

The arrangement between International Feed and the three plants was discontinued in February, 1976, and International Feed then entered the book inventory value of the inventory located at each plant as an account receivable from that plant.

After disagreements arose concerning payments for inventory, International Feed's accounting firm was hired to perform an audit to determine the amounts the three plants and International Feed owed each other under the contracts.

After the three plants refused to pay the amounts in dispute, International Feed brought suits against them. The trial court concluded that International Feed was entitled to judgments against the three plants.

From judgments entered against them, the three plants lodged these appeals and have raised the following issues:

(1) Was the trial court correct in determining as a matter of law that the Defendants were liable for losses of inventory?

(2) Was the finding of the trial court determining the amount of damages clearly erroneous?

## I.

### Losses of Inventory

The major source of dispute is the following provision in the toll agreements dated January 1, 1975:

"6. That Processor is responsible for all Kurda inventory, both raw ingredients and finished products, as to quantity and quality, and must allow inspection of same by Kurda personnel at any time."

International Feed asserts that this provision renders the three plants liable for any loss of inventory. The three plants assert that this provision simply expresses a bailor-bailee relationship making them liable only for a loss of inventory due to negligence on their part.

That losses of inventory occurred is undisputed, but the three plants assert that the loss occurred because International Feed bought excessive inventory, which deteriorated during outdoor storage.

Conclusions of law are fully reviewable by this Court. *Schwarting v. Schwarting*, 310 N.W.2d 738 (N.D.1981). Whether or not an ambiguity exists in a contract is a question to be determined by the court as a matter of law. *Berry v. Heinz*, 139 N.W.2d 145 (N.D.1965).

In construing a written contract, its language is to govern its interpretation if the language is clear and explicit and does not involve an absurdity, Section 9–07–02, N.D. C.C., and the intention of the parties is to be ascertained from the writing alone if possible. Section 9–07–04, N.D.C.C.

The trial court concluded, among other things, that:

"... The written terms of the contract between the parties clearly and unambiguously state that Defendants are responsible as to quality and quantity of the inventory, both raw ingredients and finished products. If the inventory is diminished, the Defendants are liable for the deficiency under the terms of the contract...."

We agree.

 A bailee may contract to assume a greater liability than that imposed by law. *Grady v. Schweinler,* 16 N.D. 452, 113 N.W. 1031 (1907). The appellants have so contracted in paragraph 6 of the toll agreements. The language used does more than express a bailment relationship. It enlarges the bailee's obligation.

In *Sun Printing & Publishing Association v. Moore,* 183 U.S. 642, 22 S.Ct. 240, 46 L.Ed. 366 (1902), the United States Supreme Court construed a contract to hire a yacht. The contract provided that the hirer keep the yacht in repair and also provided:

"[T]he hirer shall be liable and responsible for any and all loss and damage to hull, machinery, equipment, tackle, spars, furniture, or the like."

The Supreme Court, construing those provisions, stated:

"... it is difficult to conceive how language could more aptly express the absolute obligation, not only to repair and keep in good order to the end of the hiring and to return, but, moreover, to be responsible for any and all loss and damage to the vessel, the fixtures and appointments. These stipulations seem to us to leave no doubt of the absolute liability to return; in other words, of the putting of the risk of damage or loss of the vessel upon the hirer...." 183 U.S. at 656, 22 S.Ct. at 246, 46 L.Ed. at 375.

We believe that the provision involved in the instant case expresses a similarly absolute obligation that puts the risk of loss of inventory upon the processor. *See also, Modlin v. Walter's Fur Shop,* 96 Cal.App.2d 734, 216 P.2d 42 (1950), in which it was held

that a provision that "consignee shall be responsible for any loss from fire or theft or negligence", was a direct agreement to be responsible for any loss from theft without proof of negligence.

The three plants' reliance upon *State v. Grand Forks County,* 71 N.D. 355, 300 N.W. 827 (1941) and *Fairmont Coal Co. v. Jones & Adams Co.,* 134 F. 711 (7th Cir.1905) is misplaced.

In *State v. Grand Forks County, supra,* the State, relying on a statute providing that "each county is responsible to the state for the full amount of tax levied for state purposes", attempted to make the county treasurer liable for taxes collected, deposited in a bank, and lost when the bank closed. This Court determined that the word "responsible" imposed a condition of potential liability that could be met by showing strict adherence to statutory directions.

In *Fairmont Coal Co. v. Jones & Adams Co., supra,* the contract in issue provided:

"The first party shall insure all cargoes of coal consigned to the second party, and deliver the same safely alongside second party's docks, and said second party shall thereupon be responsible to said first party for all coal, after such delivery alongside its docks, and shall insure all such coal ... at its own expense, ..." *Id.* at 713.

The court merely determined that the word "responsible" in the contract provision at issue related to the subject of insurance and marked the time that the bailee's obligation to insure commenced. We are not here concerned with when the bailee's obligation began, but with the extent of the bailee's obligation.

 We construe the term "responsible" in paragraph 6 of the January 1, 1975, contracts to mean that the three plants were liable for losses of inventory. As we stated in *Great Plains Supply Co. v. Mobil Oil Co.,* 172 N.W.2d 241, 249 (N.D.1969):

"[W]here a party by his own contract, creates a duty or charge upon himself, he is bound to make it good, notwithstand-

ing any accident by inevitable necessity, because he might have provided against it by his own contract. The proper interpretation of the contract is to be determined by the general rules of construction recognized by the law; and, if the parties have improvidently made their contract more onerous than they expected, the difficulty cannot be removed by a violation of these rules. *Grady v. Schweinler, supra.*"

## II.

### Amount of damages

The three plants assert that the court's findings regarding damages are clearly erroneous, both as to the fact of damages and as to the amount. The three plants assert that the record is devoid of any evidence from which the trial court could properly determine damages.

■ The trial court's determination as to the amount of damages is a finding of fact which will not be set aside on appeal unless it is clearly erroneous pursuant to Rule 52(a), N.D.R.Civ.P. *F–M Potatoes, Inc. v. Suda,* 259 N.W.2d 487 (N.D.1977).

Most of the damages awarded were for loss of inventory, for which we have already determined that the three plants were liable. They concede in their brief that "much of the inventory spoiled and deteriorated so as to be unuseable", and the evidence showed that inventory was lost because of this. Other damages were awarded for such things as shrinkage, freight, and consulting fees found to be due International Feed.

Other than liability for loss of inventory, the three plants' main contentions are that the trial court should not have relied on the accounting firm's report and monthly recaps provided to the three plants by International Feed, rather than basic records, and that amounts for shrinkage, freight, and consulting fees were improperly included in the damages awarded.

International Feed, and Kurda prior to November, 1974, did the bookkeeping for the three plants. Recaps, showing amounts of inventory purchased and processed and amounts of finished products sold, together with statements of costs, expenses, deductions, and amounts due to International Feed or Kurda and the processors, were sent to each plant on a monthly basis. The monthly recaps were relied on by the parties in the regular course of business. There was testimony that records of International Feed were destroyed as a result of flooding in the basement of the accounting firm's building.

■ . Where damages have been suffered, the best evidence which circumstances will permit is all that the law requires. *North American Pump Corp. v. Clay Equipment Corp.,* 199 N.W.2d 888, 896 (N.D.1972).

"Where it is reasonably certain that damages have resulted, mere uncertainty as to the amount will not preclude recovery or prevent the jury from awarding damages. The proof must show with reasonable certainty that the plaintiff suffered damages and that such damages resulted from defendant's wrongful breach...." *Id.* at 896.

We conclude that the monthly recaps were adequate to sustain International Feed's burden of proof, especially in view of the loss of original records and the parties' prior reliance on them in their regular course of business.

■ The three plants assert that various deductions were made by International Feed that were not allowed under the contracts. With the exception of $3,435.13 that the trial court found that International Feed owed to LaMoure for WATS telephone service, the amounts of damages found by the trial court were those prayed for in the complaints, plus interest, costs, and disbursements. The amounts prayed for were those found to be owing in the accounting firm's report.[1] Those amounts

---

1. The three plants argue that cost changes resulting from deductions for shrink reserve, freight reserve, and consulting fees adopted by

International Feed's board of directors at a meeting on January 7 and 8, 1975, were unilaterally imposed by International Feed. Leo

included the disputed deductions. There was evidence from which the trial court could, and did, find that the deductions were valid either by the terms of the contract or by agreement subsequent to the contract. The deductions complained of and included in the damages awarded had been made on a monthly basis by International Feed throughout the time the contracts were in effect and before that had been deducted by Kurda. The damages awarded were supported by the accountants' audit and the monthly recaps.

We have reviewed the entire record and have not been left with a definite and firm conviction that the trial court made a mistake in awarding damages. The trial court's findings of fact, therefore, are not clearly erroneous pursuant to Rule 52(a), N.D.R.Civ.P. *Hesch v. Hesch,* 308 N.W.2d 390 (N.D.1981).

Having determined that the trial court correctly interpreted the contractual provision regarding responsibility for inventory and that the trial court's findings as to the amounts of damages are not clearly erroneous, we affirm the judgments.

VANDE WALLE, SAND, PEDERSON and PAULSON, JJ., concur.

---

Froelich, by letter on behalf of the three plants, protested the new charges and stated that the plants would no longer produce products for sale by International Feed after March 31, 1975. In March, 1975, International Feed's directors voted to transact business with the three plants pursuant to the original January 1, 1975, contracts, beginning in April, 1975. The accounting firm's report was based on the January 1, 1975, contracts, except for the period ending March 31, 1975, during which the January 7 and 8, 1975, modifications were in effect. Thus, with that exception, the damages prayed for and awarded were not based on the January 7 and 8, 1975, modifications.