William LAYMAN, Plaintiff, Appellant,
and Cross-Appellee,

v.

BRAUNSCHWEIGISCHE MASCHINEN-
BAUANSTALT, INC., a Corporation,
and BMA Machinery and Equipment
Corporation, a Corporation, Defend-
ants, Appellees, and Cross-Appellants.

Civ. No. 10449.

Supreme Court of North Dakota.

Dec. 29, 1983.

McConn, Fisher & Thune, Grand Forks, Richard S. Roberts, Wheaton, Minn., and Bruce E. Sherwood, St. Cloud, Minn., for plaintiff, appellant, and cross-appellee; argued by Michael F. Daley of McConn, Fisher & Thune, Grand Forks.

Nilles, Hansen, Magill & Davies, Fargo, for defendants, appellees, and cross-appellants; argued by Stephen W. Plambeck, of Nilles, Hansen, Magill & Davies, Fargo.

Dosland, Dosland & Nordhougen, Moorhead, Minn., for amicus curiae, North Dakota Trial Lawyer's Ass'n; appearance by Colleen Saande, argued by J.P. Dosland, Moorhead, Minn.

ERICKSTAD, Chief Justice.

This is an appeal by the plaintiff, appellant, and cross-appellee, William Layman, from a judgment entered by the District Court of Cass County on February 25, 1983, pursuant to an action brought by Layman to recover damages for personal injuries he received on November 14, 1974, in a work-related accident at a beet sugar factory owned by Minn-Dak Farmers Cooperative, Inc. [Minn-Dak], and designed and constructed by Braunschweigische Maschinenbauanstalt, Inc., and BMA Machinery and Equipment Corporation[1] [hereinafter referred to collectively as BMA]. BMA, the defendants, appellees, and cross-appellants, also appeal from the judgment entered in favor of Layman and against BMA in the amount of $17,962.88 plus costs and disbursements.

On December 18, 1972, BMA entered into a written contract with Minn-Dak wherein BMA agreed to design, supply, acquire, and construct for Minn-Dak a sugar beet processing plant on a site located near Wahpeton, North Dakota. Under the terms of the contract, BMA guaranteed the timely construction of the plant to be ready for "start up", defined in the contract as the date Minn-Dak was to commence the slicing of sugar beets to be processed in the plant, on September 30, 1974. Relevant provisions of the contract between BMA and Minn-Dak, enumerating various contractual duties assumed by BMA, include:

"ARTICLE 2.00 "CONTRACTOR will undertake

"2.1 To design, supply, acquire, and construct for OWNER [Minn-Dak] the PLANT, and for this purpose CONTRACTOR [BMA] will:

2.1.1 Design and engineer the final technological process and final lay-out of the PLANT;

2.1.2 Supply or acquire all necessary machinery and equipment and perform all necessary building and civil engineering work as well as installation work for the PLANT ....

"2.2 While performing his contractual obligations stipulated in Clause 2.1:

\* \* \* \* \* \*

2.2.2 To determine ... under his sole responsibility those parts of the machinery and equipment to be manufactured and/or supplied by CONTRACTOR from Germany;

2.2.3 To subcontract under his sole responsibility the supply of all other parts of the machinery and equipment with suppliers and to subcontract the construction and installation of the PLANT with subcontractors;

\* \* \* \* \* \*

"2.3 In addition to his contractual obligations stipulated in Clause 2.1 and 2.2:

2.3.1 To supervise and to instruct by specialized and appropriate personnel OWNER's technical staff and operating labor during TRIALS [defined in

[1]. The record indicates that Braunschweigische Maschinenbauanstalt, Inc. a corporation organized under the laws of the Federal Republic of Germany, and BMA Machinery and Equipment Corporation, a corporation organized under the laws of Colorado, operate as a joint venture in designing and constructing beet sugar factories and in manufacturing beet sugar processing machinery and equipment.

the contract as mechanical and functional test-runs performed before "start-up", during which the proper functioning of the installed machinery and equipment was to be checked], START–UP, and PERFORMANCE TEST [defined as the test-run after "start-up" during which BMA's performance guarantees under the contract were to be demonstrated and ascertained];

2.3.2 To supervise by specialized and appropriate personnel the technological and mechanical operation of the PLANT for a period of 60 days commencing with START–UP, and at the same time to train OWNER's technical staff and operating labor how to properly operate the PLANT."

The testimony of Gerald Shannon, the general manager and chief executive officer of Minn-Dak, and Florian Sosnitza, a night shift supervisor for BMA at the time Layman was injured, indicates that "start-up" occurred in early November, 1974. Sosnitza testified that the "trials" were performed by BMA prior to "start-up". Shannon testified, however, that BMA never ran the "performance test".

Layman was hired by Minn-Dak on November 13, 1974, as a general laborer. On November 14, 1974, Layman and other workers were directed to shovel syrup, which had spilled from processing machinery to the floor of the plant, into pails for return to the beet sugar process. While so doing, Layman backed into, and was injured by, an unguarded rotating shaft which protruded from a gear box mounted on a processing machine known as a "crystallizer".

The Minn-Dak plant contained eighteen crystallizers which, in the completion stages of sugar beet processing, transform a syrup into crystallized sugar. The trial court, in its findings of fact, described the crystallizers as follows:

"5. A crystallizer is a large cylindric drum that rotates horizontally by an electric motor. Each crystallizer has its own electric motor with an off on switch nearby. The crystallizer has fins that rotate within the crystallizer drum simultaneously while the drum is rotating. In the event the motor should fail, the crystallizer and fins within would stop rotating and within a short period of time, measured in minutes, the syrup inside the crystallizer would become solid. To prevent this from happening in event of a power failure, the gear box for each crystallizer had a device wherein a crank would be inserted into the gear box and a person would manually rotate the crank which in turn would cause the crystallizers to rotate.

"6. The crank would fit on a protruding shaft from the gear box. The shaft is square and protrudes out from the gear box cover several inches. A cover for the protruding shaft had not been installed at the time of the accident."

The gear boxes for the crystallizers from which the rotating shaft protruded were manufactured by a European company, not BMA; however, BMA had been alerted by the European manufacturer that rotating parts had to be "protected against touching by the customer." Plastic guards for the shafts were shipped with the gear boxes from Germany; however, screw holes on the guards were mismatched so that they were unusable. The trial court found that officials of BMA and Minn-Dak agreed orally to have Minn-Dak build guards for the shafts in its workshop rather than wait to have replacement guards shipped from Europe. As part of this verbal agreement, BMA was to give Minn-Dak credit on the plant contract for fabricating the guards. The design and specifications for the replacement guards were made by BMA. Sosnitza took measurements for the guards in the presence of Herman Lauck, a shift maintenance foreman for Minn-Dak, and explained to Lauck the importance of the guards as protection for persons in the vicinity of the gear boxes. Sosnitza testified that he observed completed guards lying on a windowsill in Minn-Dak's workshop several days prior to Layman's accident. He testified further that he in-

formed Lauck several times of the need to install the guards. Prior to the accident, Sosnitza placed barricades at the ends of a narrow walkway located directly in front of the crystallizers to "protect people from the rotating shafts." These barricades, which consisted of wood planks, rope, and other salvage material, were frequently knocked over and had to be reconstructed.

Limitations in United States' visas issued to BMA employees and officials prevented them from performing manual labor at the plant. They were permitted only to supervise and advise. The trial court found that BMA officials had no direct control over the actions of Minn-Dak employees. All matters between BMA and Minn-Dak had to be handled through supervisory personnel of Minn-Dak.

At the time Layman was hired and during his short employment with Minn-Dak, he was given no safety training, nor was he warned of any danger or of the fact that there were no guards on the rotating shafts of the crystallizers. During his contact with the shaft, Layman had his clothing, including boots he was wearing, torn from his body. He was thrown to the floor. The trial court found that at this point in time Layman's injuries were minimal. Layman got up off the floor and then, apparently embarrassed because he had no clothing on, attempted to grab his clothing which was still revolving on the shaft. His arm became entangled in the clothing; he was spun around and fell again to the floor. Injuries sustained by Layman as a result of the mishap included a fracture of the humerus, radius, and ulna of the right arm, a fractured hip bone, and two fractured ribs.

Layman received workmen's compensation benefits in the amount of $18,779.74. Generally, when an employer is in compliance with the workmen's compensation statutes, the employee's exclusive remedy against the employer is limited to recovery under the workmen's compensation statutes. *Gernand v. Ost Services, Inc.*, 298 N.W.2d 500, 504 (N.D.1980); §§ 65–01–01, 65–01–08, 65–04–28, and 65–05–06, N.D. C.C.

Layman initiated this action, in accordance with Section 65–01–09, N.D.C.C.,[2] against BMA by service of summons and complaint on September 14, 1979, which complaint alleged negligence, breach of warranty, and strict liability. The trial court determined that the role of strict liability in tort as adopted by this Court in *Johnson v. American Motors Corporation*, 225 N.W.2d 57 (N.D.1974), was not applicable and that any warranty claims were barred by the four-year statute of limitations provided by Section 41–02–104, N.D.C.C. The trial court determined, however, that the negligence of both BMA and Minn-Dak were the proximate cause of Layman's injuries and apportioned the negligence in the following manner: 75% to Minn-Dak; 25% to BMA.

The trial court found that Layman's total damages were $71,851.37, which it reduced to $17,962.88 plus costs and disbursements "calculated by the comparative negligence statute at 25 percent of $71,851.50."

---

2. Section 65–01–09, N.D.C.C., reads, in pertinent part, as follows:

"*Injury through negligence of third person— Option of employee—Fund subrogated when claim filed.* When an injury or death for which compensation is payable under provisions of this title shall have been sustained under circumstances creating in some person other than the fund a legal liability to pay damages in respect thereto, the injured employee, or his dependents may claim compensation under this title and proceed at law to recover damages against such other person. The fund shall be subrogated to the rights of the injured employee or his dependents to the extent of fifty percent of the damages recovered up to a maximum of the total amount it has paid or would otherwise pay in the future in compensation and benefits for the injured employee. The bureau's subrogation interest may not be reduced by settlement, compromise, or judgment. The action against such other person may be brought by the injured employee, or his dependents in the event of his death. Such action shall be brought in his or in his dependents' own right and name and as trustee for the workmen's compensation bureau for the subrogation interest of the bureau. . . ."

Layman contends the trial court erred in interpreting the comparative negligence act, Section 9–10–07, N.D.C.C., to require the reduction of his recovery against BMA by the percentage of negligence attributable to Minn-Dak. BMA, in its cross-appeal, contends the trial court's finding that it was negligent and that such negligence was a proximate cause of Layman's injuries is not supported by substantial evidence. It further asserts that these findings are the result of an erroneous conception of the law of negligence, and are, therefore, clearly erroneous. In addition, BMA contends the trial court's failure to attribute any negligence to Layman is also clearly erroneous.

We will begin by addressing the contentions raised in BMA's cross-appeal.

## I.

■ We have often said that issues of negligence, proximate cause, and comparative negligence are questions of fact for the trier of fact unless the evidence is such that reasonable minds can draw but one conclusion. *Peterson v. Hart*, 278 N.W.2d 133, 135 (N.D.1979); *Bauer v. Graner*, 266 N.W.2d 88, 92 (N.D.1978). Thus, in reviewing the merits of BMA's cross-appeal we are guided by Rule 52(a), N.D.R.Civ.P., which provides that findings of fact will not be set aside unless "clearly erroneous". *See F–M Potatoes, Inc. v. Suda*, 259 N.W.2d 487, 492 (N.D.1977); *McKechnie v. O'Neil*, 252 N.W.2d 875, 877 (N.D.1977). A finding is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *In re Estate of Elmer*, 210 N.W.2d 815, 820 (N.D.1973). A finding by the trial court is not to be disturbed unless it is clearly erroneous, either upon a clear demonstration that it is not supported by substantial evidence or that it was induced by an erroneous view of the law. *Stee v. "L" Monte Industries, Inc.*, 247 N.W.2d 641, 644 (N.D. 1976).

The trial court found that BMA, acting in a supervisory capacity under the terms of its contract with Minn-Dak, failed to discharge its duty to furnish reasonably safe conditions for Layman to work in by allowing the crystallizers to operate without guards. The pertinent findings of fact and conclusions of law of the trial court read as follows:

"21. ... The Court attributes the negligence to be allowing the machinery to operate without checking to see if the guards were installed. BMA knew of the danger of the unguarded shaft and repeatedly advised Minn-Dak to put the guards on and repeatedly admonished Minn-Dak of the danger if unguarded. BMA's knowledge of the danger is evidenced from their placing barricades in the alleys in the vicinity of the crystallizers. Because the barricades had been moved prior to the accident at various times, BMA had knowledge that the barricades were not a sufficient method of eliminating the danger. With knowledge of such danger and with supervisory authority then still vested with BMA, BMA was negligent in allowing the crystallizers to operate. There was a lack of concern by BMA for the probable consequences of an act or failure to act as a reasonably prudent person would have had in conducting his affairs.

"22. Under the terms of the contract between Minn-Dak and BMA in Section 2.3.1, BMA had the obligation to supervise and to instruct by specialized and appropriate personnel the technical staff and operating labor during trials, start up and performance tests. In Section 2.3.2 BMA was obligated under the contract with Minn-Dak to supervise by specialized personnel the technological and mechanical operation of the plant for a period of 60 days commencing with start up. The accident occurred during this 60 day period of time. BMA should not have permitted the start up without checking to see if the guards were placed on the gear box and allowing the start up without checking on the gear knowing the danger involved constitutes negli-

gence. Such negligence is a proximate cause of the injury to Plaintiff."

"CONCLUSIONS OF LAW

\*    \*    \*    \*    \*    \*

"4. On the theory of negligence, the fact that BMA warned Minn-Dak of the dangers of operating the machine without a guard does not insulate BMA from liability to Layman. The warning of danger of injury reasonably anticipated from its use must be communicated to the persons in the zone of danger. *Seibel v. Symons Corporation*, 221 NW 2d 50 (ND 1974).

"5. Where BMA was still obligated to furnish supervision and advice in the test runs of the sugar beet factory of Minn-Dak, BMA had an obligation to stop the test or delay the test when it had knowledge or should have had knowledge that guards had not been placed on the gear boxes of the crystallizers. Failing to delay or stop the plant's test run under the facts in this case constitutes ordinary negligence. Ordinary care means such care as a person usually exercises about his own affairs of ordinary importance.

"6. The liability for negligence of BMA is not based on product liability negligence, but on the premise that BMA and Minn-Dak were jointly operating the sugar beet plant in different capacities, and in such supervising and advisory capacity, BMA owed a duty to furnish reasonably safe conditions for Layman to work in. BMA had joint control over the operation, even though BMA was not the employer of Layman."

■ BMA contends the trial court's finding that it was negligent proceeds from an erroneous conception of the law of negligence and is clearly erroneous because Layman was not a party to, or in privity with a party to, the contract. In support of its argument, BMA directs our attention to this Court's decision in *Johnson v. Clark*, 77 N.D. 14, 39 N.W.2d 431 (1949), for the proposition that a third person cannot maintain an action upon a contract unless the contract was made expressly for the benefit of the third person. *Johnson, supra*, involved an action brought by the plaintiff to recover on an earnest money check executed by the defendant pursuant to the parties' agreement concerning the sale of real property owned by the plaintiff. The instant case does not involve an action for breach of contract. BMA argues, however, that privity of contract has not been abrogated for purposes of bringing an action for the negligent performance of a contract; and as the contract between BMA and Minn-Dak was not made expressly for Layman's benefit, it imposed no legal duty upon BMA to Layman. For reasons discussed below, we agree with Layman's contention that it was not necessary for him to establish contractual privity in order to bring a tort action against BMA for negligence.

■ A plaintiff's first requisite in establishing actionable negligence is to show the existence of a duty on the part of the person alleged to have been negligent to protect the plaintiff from injury. *Carlson Homes, Inc. v. Messmer*, 307 N.W.2d 564, 566 (N.D.1981); *Brauer v. James J. Igoe & Sons Construction, Inc.*, 186 N.W.2d 459, 468 (N.D.1971). Where there exists no legal duty or obligation, there cannot be actionable negligence. *Schleicher v. Western State Bank of Devils Lake*, 314 N.W.2d 293, 298 (N.D.1982); *Larson v. Meyer*, 135 N.W.2d 145, 154 (N.D.1965).

■ The duty to protect another from injury, as an essential element of actionable negligence, may arise out of a relationship or state of facts created by contract, whereby acts or omissions in performance of such a duty may be tortious. *See, e.g., Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 441 A.2d 620, 624 (1982); *Clark v. Dalman*, 379 Mich. 251, 150 N.W.2d 755, 760 (1967); *Rozner v. Resolute Paper Products Corp.*, 37 A.D.2d 396, 326 N.Y. S.2d 44, 46 (N.Y.App.Div.1971); *Firemen's Mutual Insurance Company v. High Point Sprinkler Company*, 266 N.C. 134, 146 S.E.2d 53, 60 (1966); *Friedhoff v. Engberg*, 82 S.D. 522, 149 N.W.2d 759, 762

(1967). *See also Jones v. Boeing Company*, 153 N.W.2d 897, 904 (N.D.1967) [Contracting architect-engineer under duty to exercise ordinary care in the design and supervision of construction project for the protection of persons who foreseeably and with reasonable certainty may be injured by the failure to do so]. *See generally* 57 Am.Jur.2d *Negligence* § 47 (1971). The mere breach of a contract does not, by itself, furnish a basis for liability in tort for negligence; however, negligent conduct may be involved in the breach of a contract or, even if there has been no breach of contract, liability in tort for negligence may arise because of injury to persons resulting from negligence occurring in the course of performance of the contract. 65 C.J.S. *Negligence* § 4(6) (1966).

BMA directs our attention to 57 Am. Jur.2d *Negligence* § 48, p. 397, wherein is set forth the "traditional" rule requiring privity of contract in order to recover in tort for the breach of a duty existing by virtue of contract. It is also noted in 57 Am.Jur.2d, however, that privity of contract is not necessary for the existence of a duty where the duty or relation of the contractor and third party is based on something other than the contract:

"[A] contractor's duty to use care may be based on positive law or public policy, rather than the contract, and, in such a case, since the contract is not the basis of the cause of action for negligence, privity of contract is not required nor is it a relevant factor. If the defendant has committed only a breach of contract, he is liable only to those with whom he has contracted; but if he has tortiously committed a breach of duty apart from the contract, he is not protected by setting up a contract in respect of the same matter with another person. *Where one undertakes by contract to perform a certain service and is chargeable with the duty of performing the work in a reasonably proper and efficient manner, and injury occurs to a blameless person, the injured person has a right of action directly against the offending contractor which is not based on any contractual obligation but rather on the failure of such contractor to exercise due care in the performance of his assumed obligation."* 57 Am.Jur.2d *Negligence* § 50, pp. 398–99. [Emphasis added.]

*See also* W. Prosser, *Handbook of the Law of Torts*, § 93, p. 622 (4th ed. 1971).

Thus, the duty owed by a defendant to a plaintiff may arise from a contractual promise made to another; however, the duty sued on in a negligence action is not the contractual promise but the duty to use ordinary care in affirmatively performing that promise. The duty exists independent of the contract, and privity of contract is not required.

BMA, in its contract with Minn-Dak, agreed to supply or acquire all the necessary machinery for the plant, to supervise and instruct Minn-Dak's technical staff and operating labor during "start-up" and test-runs, and to supervise, for a period of sixty days commencing with "start-up", the technological and mechanical operation of the plant. BMA had a duty to exercise ordinary care and skill in its undertaking with Minn-Dak for the protection of persons who foreseeably or with reasonable anticipation may have been injured by its failure to do so. We conclude the trial court's finding that BMA was negligent, in light of the fact that Layman was not a party to or in privity with a party to the contract between BMA and Minn-Dak, did not proceed from an erroneous conception of the law of negligence.

The question whether or not Layman's injuries could have been reasonably anticipated by BMA, so as to have imposed upon BMA the aforementioned duty of care, was a question of fact for the trier of fact. *See Kirton v. Williams Electric Cooperative, Inc.*, 265 N.W.2d 702, 705 (N.D. 1978). The trial court found that BMA knew of the dangerous propensity of the unguarded shaft and based its determination on the fact that Sosnitza placed barricades on the walkway in front of the crystallizers. Further evidence is found in tes-

timony elicited from Sosnitza and Dieter Ohm, the BMA project manager for the Minn-Dak plant, that there existed a great likelihood of processing spills occurring once the processing of sugar beets began. The fact that BMA was warned by the manufacturer of the gear boxes as to the necessity of guarding the shafts, and, in turn, warned Minn-Dak of the need to guard the shaft also reveals that Layman's injuries should have been reasonably anticipated by BMA.

BMA next asserts the trial court's finding that it was negligent is not supported by substantial evidence and is clearly erroneous. Specifically, BMA contends the trial court's finding that it was negligent in "allowing the machinery to operate without checking to see if the guards were installed" is directly contrary to its finding that BMA repeatedly advised Minn-Dak of the need to install the guards for the safety of persons working around the crystallizers, and also proceeds from an assumption for which there was no evidence that BMA had authority to prevent Minn-Dak from operating the plant.

■■■ Our review of the trial court's finding of negligence is limited by Rule 52(a), N.D.R.Civ.P. The trial court's findings are to be given the same weight as a jury verdict and, in reviewing those findings, the evidence must be viewed in a light most favorable to the findings. *Hoge v. Burleigh County Water Management District,* 311 N.W.2d 23, 28 (N.D.1981); *Kleinjan v. Knutson,* 207 N.W.2d 247, 251 (N.D. 1973). The mere fact that we might have reviewed the facts differently if we had been the initial trier of the case does not entitle us to reverse the lower court. *Hoge, supra.*

A review of the trial court's findings reveals that BMA's negligence was premised on its allowing the crystallizers to operate, in its supervisory capacity under the terms of its contract with Minn-Dak, without protective guards on the rotating shafts. Shannon testified that during the 60-day period BMA was to furnish the necessary expertise to train Minn-Dak employ-

ees and familiarize them with the European machinery. Francis Borscheim, a Minn-Dak employee at the time of the mishap, testified "the Germans" were actively supervising the plant, were the only ones who understood was was going on, and that his foreman "took orders" from them. This testimony and the express terms of the contract itself consist of substantial evidence upon which the trial court could conclude that BMA exercised broad supervisory authority under the contract, and, in conjunction with operation of the plant without the installation of the protective guards, was negligent.

■■■ BMA also contends the trial court inappropriately relied upon this Court's decision in *Seibel v. Symons Corporation,* 221 N.W.2d 50 (N.D.1974), as authority to support its conclusion that BMA's warning to Minn-Dak, concerning the danger involved in operating the processing machinery without guards, was insufficient to relieve BMA of liability for its negligence. In *Seibel, supra,* a contractor's employee who fell and was injured as a result of the breaking of a weld on a support rod to a concrete form, to which the plaintiff had attached the lanyard of his safety belt, brought an action against the manufacturer of the form. The manufacturer furnished the employer-contractor, at the time it delivered the form, a manual which contained the statement "do not hang off v-shaped end rail support rods." We determined "the jury was justified in finding the manufacturer negligent in either the design or manufacture of the [form] or in failing to give an adequate warning, or in failing to adequately communicate a warning to the employee who was the ultimate user."

BMA argues that because *Seibel, supra,* involved a products liability action against a manufacturer for negligent design and manufacture, it has no application to the instant case as BMA did not design or manufacture a defective product. Layman argues that *Seibel, supra,* is directly on point for the proposition for which it was cited by the trial court. True, it may not

have been a defective product as such, but it was an unreasonably dangerous product if operated without the protective guards. In permitting the plant to operate without the guards, while participating in the supervision all the while, BMA participated in negligent conduct. At least it cannot be said that findings to that effect were clearly erroneous.

BMA next contends the trial court's failure to find that its negligence was superseded by the negligence of Minn-Dak is clearly erroneous.[3] BMA argues that any negligence attributed to it "came to rest and the chain of causation was broken when Minn-Dak unforeseeably failed to install the guards or warn its employees of the hazard," and when BMA reminded Minn-Dak after the commencement of start-up and before the accident that the guards had still not been installed.

To warrant a finding that a negligent act is a proximate cause of an injury, it must appear that the injury complained of was the natural and probable result of the negligent act, unbroken by any controlling, intervening cause. *Moum v. Maercklein*, 201 N.W.2d 399, 403 (N.D.1972). In order to relieve BMA of its responsibility for the consequences of its negligence, the intervening cause, Minn-Dak's negligence, must have constituted a new and independent force which severed the causal connection between BMA's negligence and Layman's injuries, and not merely a concurrent and contributing cause of Layman's injuries. *Roquette v. North American Van Lines, Inc.*, 187 N.W.2d 78, 81 (N.D.1971); *Brauer, supra,* 186 N.W.2d at 471–72; *Chicago, Milwaukee, St. Paul & Pacific Railroad Company v. Johnston's Fuel Liner's Inc.*, 122 N.W.2d 140, 148 (N.D. 1963).

We believe the evidence is such that the trial court could reasonably have found, although it did not specifically so state, that the negligence of Minn-Dak should have been foreseen by BMA. *See Brauer, supra.* Sosnitza testified that he told Lauck several times to install the guards, yet no effort was made on behalf of Minn-Dak to install them. Sosnitza also observed completed guards lying on a windowsill in Minn-Dak's workshop prior to the accident. BMA was, or should have been, fully aware of the course of conduct Minn-Dak had undertaken with respect to the guards.

Thus, we conclude the trial court's finding that BMA's negligence was a proximate cause of Layman's injuries is not clearly erroneous.[4] It is not necessary that the negligent act be the sole cause or the last negligent act prior to the injury in order to constitute a proximate cause of the injury. *F–M Potatoes, Inc. v. Suda, supra,* 259 N.W.2d at 493; *Chicago, M., St. P. & P.R. Co. v. Johnston's Fuel Liners, supra.*

BMA also contends the failure of the trial court to find negligence on the part of Layman is clearly erroneous. The perti-

---

**3.** The following reasons were given by the trial court in finding that Minn-Dak was negligent and that such negligence was a proximate cause of Layman's injuries:

"a.) Failure to put the guard on the gear box even when told to do so repeatedly and knowing the danger of the unguarded shaft.

"b.) Failure to properly supervise Layman so as to advise him of the danger of the unguarded shaft.

"c.) Failure to provide a safe place to work for its employees.

"d.) Failure to properly train Layman as to safety and dangers in his work."

**4.** BMA has cited *Wentz v. Deseth,* 221 N.W.2d 101 (N.D.1974), in support of its argument that the negligence of Minn-Dak constituted a con-

trolling, intervening cause which broke the causal connection between BMA's negligence and Layman's injuries. In *Wentz, supra,* the plaintiff brought an action against his eighth grade teacher, who had supervised a candle-making project, for burns suffered in school. The teacher had left the classroom during a study period after instructing the students to put out their candles. We determined that the pouring of after-shave lotion upon a lighted candle by another student, resulting in flames spewing from the lotion container and injuring the plaintiff, was a controlling, intervening cause of the plaintiff's injuries. The burning candle atop the plaintiff's desk was not a proximate cause of the plaintiff's injuries. *Wentz* is clearly distinguishable from the instant case.

nent finding of the trial court regarding this issue reads as follows:

"This Court finds no negligence on the part of the Plaintiff. He was not negligent in backing into the rotating shaft in the first place in that he had no knowledge of the absence of the guard or its danger. He violated no safety precautions in that he was never given any safety training. The fact that Layman after being stripped of his clothing by the rotating shaft tried to retrieve his clothing and was seriously injured does not constitute negligence. A person of common sense and ordinary prudence might act the same under the circumstances. Even though the original contact with the shaft may not have caused any serious bodily injury, it certainly would stun him so as to lessen his reasoning ability to comprehend such sudden danger. Also it would be difficult to comprehend under such circumstances and in such a short span of time the danger of clothing rotating on a shaft and the possibility of his arm being caught in such clothing. There is no evidence to convince this Court that the unguarded shaft was obvious or should have been discovered by him if he had used reasonable care and caution."

■ The trial court's findings concerning Layman's lack of knowledge of the dangerous propensity of the unguarded shaft and the impairment of his reasoning ability subsequent to his initial contact with the shaft are supported by substantial evidence in the record. Shannon testified that Minn-Dak employees, when hired, were provided only generalized information concerning the plant's safety policy. Layman testified that no hazards were pointed out to him and that prior to the accident he did not know what a crystallizer was: "[T]o me the machines [crystallizers] were just a big round brown vat deal. I didn't know that motors were on them ...." Layman also testified that there were no barricades located near the crystallizers on the day of the accident.

Layman further testified that in his initial encounter with the shaft his head was "banged once" resulting in his being "stunned." All he could see were a "bright light" and "stars", and he "had an awful humming in [his] head like somebody playing an electric organ." We conclude the trial court's finding that Layman was unaware of any danger posed by the unguarded shaft prior to the accident and thereafter exercised ordinary care under the circumstances to avoid injury to himself is based on substantial evidence and is not clearly erroneous.

Accordingly, we hold that the trial court's findings that BMA acted negligently in its undertaking with Minn-Dak and that such negligence was a proximate cause of Layman's injuries are not clearly erroneous and will not be set aside on appeal.

## II.

We now turn to the issue of the propriety of the trial court's action in reducing Layman's damage recovery against BMA by the percentage of negligence attributable to Minn-Dak.

■ As noted above, Layman received workmen's compensation benefits for the injuries he sustained as a result of the accident. Section 65–05–06, N.D.C.C., provides that payment of compensation or other benefits by the Workmen's Compensation Bureau to an injured employee is "in lieu of any and all rights of action whatsoever against the employer" of the injured employee. We have previously said that the exclusive remedy provisions of our workmen's compensation statutes operate to foreclose an employer's liability for contribution to a third-party tort-feasor, irrespective of the joint tort-feasor contribution act, Chapter 32–38, N.D.C.C. *See Gernand v. Ost Services, Inc., supra,* 298 N.W.2d at 505; *Sayler v. Holstrom,* 239 N.W.2d 276, 282–83 (N.D.1976).[5] In both

5. Our case law is in harmony with a majority of those jurisdictions which have construed comparable exclusive remedy provisions and have held that the employer whose concurring negli-

cases we deemed it appropriate to defer to the legislature the consideration of any changes in the exclusive remedy provisions and subrogation provisions of the workmen's compensation statutes.

The trial court found that Minn-Dak was 75% negligent and that BMA was 25% negligent. Layman's damages were assessed as $71,851.50. Perceiving it as "unjust" for Layman to receive the full amount of his damages from BMA,[6] the trial court reduced the damage award by the percentage of negligence attributable to Minn-Dak and entered judgment in favor of Layman in the amount of $17,962.88.

Layman contends the trial court, by limiting BMA's liability to its proportionate share of fault, effectively "abolished" joint and several liability[7] in contravention of Section 9-10-07, N.D.C.C., North Dakota's comparative negligence statute. Section 9-10-07, enacted by the North Dakota Legislature in 1973, reads as follows:

"*Comparative negligence.*—Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person recovering. The court may, and when requested by either party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of negligence attributable to each party; and the court shall then reduce the amount of such damages in proportion to the amount of negligence attributable to the person recovering. When there are two or more persons who are jointly liable, contributions to awards shall be in proportion to the percentage of negligence attributable to each; *provided, however, that each shall remain jointly and severally liable for the whole award.* Upon the request of any party, this section shall be read by the court to the jury and the attorneys representing the parties may comment to the jury regarding this section. [Emphasis added]."

Senate Bill 2340,[8] which would have deleted the above-emphasized language in Section

---

gence contributed to the employee's injury cannot be sued or joined by the third party as a joint tort-feasor, whether under contribution statutes or at common law, because the employer is absolutely liable irrespective of negligence. "The claim of the employee against the employer is solely for statutory benefits; his claim against the third person is for damages. The two are different in kind and cannot result in a common liability." Larson, *Workmen's Compensation Law* 2A, § 76.20 (1982). *See also Mulder v. Acme-Cleveland Corporation,* 95 Wis.2d 173, 290 N.W.2d 276 (1980).

6. In denying Layman's motion for amended findings of fact, conclusions of law and order for judgment, the trial court gave the following rationale for reducing Layman's recovery by the percentage of negligence attributable to Minn-Dak:

"For this Court to give Plaintiff all the benefits of Workmen's Compensation as against his employer and to also allow him to recover 100 percent as against another tortfeasor would place Workmen's Compensation and its insured Minn-Dak with no financial liability for its participation in the tort and then placing full financial liability on BMA without

recourse to Minn-Dak. This strikes this Court as unjust, illogical and arbitrary. Plaintiff cannot by manipulation of the laws have the best of two worlds. See *Bartels vs City of Williston,* 276 NW2d 113 (ND 1979)."

7. This Court has held that when acts of two or more persons concurrently cause injury to another, which acts each constitute a proximate cause of the injury, the injured person may sue and recover from one or all of the tort-feasors. *Truscott v. Peterson,* 78 N.D. 498, 50 N.W.2d 245, 254 (1951).

8. Senate Bill 2340, Forty-eighth Legislative Assembly, which was defeated, would have amended Section 9-10-07, as follows:

"9-10-07. *Comparative negligence....* When there are two or more persons who are jointly liable, contributions to awards shall *only* be in proportion to the percentage of negligence attributable to each; provided, however, that each shall remain jointly and severally liable for the whole award. Upon the request of any party, this section shall be read by the court to the jury and the attorneys representing the parties may comment to the jury regarding this section."

9–10–07, retaining the doctrine of joint and several liability in cases involving more than one tort-feasor, was considered by the 1983 Legislative Assembly and was defeated.

In *Bartels v. City of Williston*, 276 N.W.2d 113 (N.D.1979), we noted that Section 9–10–07 was derived from the Minnesota comparative negligence statute enacted in 1969 which, in turn, was based upon Wisconsin's comparative negligence statute.[9] The Wisconsin comparative negligence statute does not contain provisions which provide, as does Section 9–10–07, N.D.C.C., for the retention of joint and several liability for those who are jointly liable. However, shortly after the statute's enactment in 1931, the Wisconsin Supreme Court held that the statute did not effect "any change in the common-law rule that all tort-feasors who are liable at all are liable to the injured person for the entire amount now recoverable by him." *Walker v. Kroger Grocery & Baking Co.*, 214 Wis. 519, 252 N.W. 721, 728 (1934).

The Wisconsin Supreme Court has had occasion to reject arguments for holding a joint tort-feasor liable only for his proportionate share of fault. In *Wisconsin Natural Gas Company v. Ford, Bacon & Davis Construction Corporation*, 96 Wis.2d 314, 291 N.W.2d 825 (1980), the Wisconsin Supreme Court was confronted with a fact situation in which a jury found the plaintiff 40% negligent, and two defendants 45% negligent and 15% negligent, respectively. The former defendant appealed a judgment entered in favor of the plaintiff and against it for 60% of the total damages. The appellant argued that the court should abolish the doctrine of joint and several liability as

a matter of fairness, and hold it responsible for only 45% of the plaintiff's damages. The Wisconsin court, after reviewing its decision in *Walker, supra*, said:

"Since that decision in 1934, this court has periodically considered the continuing vitality of the legal doctrine of joint and several liability. In *Chille v. Howell*, 34 Wis.2d 491, 149 N.W.2d 600 (1967), this court was confronted with a fact situation where the plaintiff was 5% negligent, a defendant was 75% negligent (but judgment proof), and a solvent defendant 20% negligent. The solvent defendant who was only 20% negligent urged '... that in this instance where recovery against Howell [the judgment-proof defendant] is impossible or improbable that Chille's [the plaintiff] negligence should be compared to Grimstad [the solvent defendant] as a whole which would reduce Chille's recovery by ⁵/₂₅ths so as to permit a recovery of 80 percent of the amount awarded rather than 95 percent as ordered by the trial court.' *Id.* at 500, 149 N.W.2d at 605. The court rejected this approach, holding:

'The construction of the comparative negligence statute as announced in *Walker v. Kroger Grocery & Baking Co., supra*, has been the law since 1934; several of our cases have reaffirmed the rule based upon the ancient common-law concept of joint and several liability of joint tort-feasors. We are not persuaded it should be changed.' *Id.* at 500, 149 N.W.2d at 605.

"In *Fitzgerald v. Badger State Mutual Casualty Co.*, 67 Wis.2d 321, 227

---

**9.** We correctly noted in *Bartels, supra*, that the Minnesota comparative negligence statute, Minn.Stat. § 604.01, was amended in 1978 by deleting the last sentence, "When there are two or more persons who are jointly liable, contributions to awards shall be in proportion to the percentage of negligence attributable to each, provided, however, that each shall remain jointly and severally liable for the whole award." This sentence was merely shifted, however, to Minn.Stat. § 604.02. *See Maday v. Yellow Taxi Company of Minneapolis*, 311 N.W.2d 849, 850, n. 1 (Minn.1981).

The Wisconsin comparative negligence statute, Wis.Stat. § 895.045, reads as follows:

"Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering."

N.W.2d 444 (1975), the plaintiff was 5% negligent, one defendant, 30% and the other 65% negligent. Since the second defendant, adjudged 65% negligent, was judgment proof, the defendant, found 30% negligent, argued that he should not be held liable for the entire judgment, but only for his *proportionate* share of the damages (30%). The court once again declined to modify the rule of joint and several liability quoting *Chille v. Howell, supra,* and adding 'No new argument is advanced here warranting our modification or reversal of *Chille.*' *Id.* at 332, 227 N.W.2d at 449. Additionally, when this court fashioned a rule of contribution among joint tortfeasor defendants in *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105 (1962), this court affirmed the doctrine of joint and several liability among concurrent tortfeasors: 'We make it plain at the outset that this refinement of the rule of contribution does not apply to or change the plaintiff's right to recover against any defendant tortfeasor the total amount of his damage to which he is entitled.' *Id.* at 6, 114 N.W.2d at 107.

"Moreover, recently the California court in *American Motorcycle Ass'n v. Superior Court of Los Angeles County,* 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899 (1978), in support of the doctrine of joint and several liability, stated:

> 'In many instances a plaintiff will be completely free of all responsibility for the accident, and yet, under the proposed abolition of joint and several liability, such a completely faultless plaintiff, rather than a wrongdoing defendant, would be forced to bear a portion of the loss if any one of the concurrent tortfeasors should prove financially unable to satisfy his proportioned share of the damages.' *Id.* at

589, 146 Cal.Rptr. at 188, 578 P.2d at 905.

"Thus, the elimination of the doctrine of joint and several liability could in many instances work a hardship on a plaintiff who was free of any negligence.

"Therefore, in view of our prior holdings in *Chille v. Howell, supra,* and *Fitzgerald v. Badger State Mut. Cas. Co., supra,* reaffirming the application of the well established common-law doctrine of joint and several liability to our present rule of comparative negligence, and in view of the petitioner's failure to advance any compelling reasons or new legal arguments for modifying or abandoning the rule of joint and several liability in this case, we are thus not persuaded that it should be changed, modified or eliminated." 291 N.W.2d at 834–35.[10]

The Minnesota Supreme Court has consistently applied its comparative negligence statute and the doctrine of joint and several liability retained therein to hold each defendant liable for a plaintiff's total recoverable damages even when a jury finds that defendant only partially at fault. *See Maday v. Yellow Taxi Company of Minneapolis,* 311 N.W.2d 849, 850 (Minn.1981); *Jack Frost, Inc. v. Engineered Building Components Company, Inc.,* 304 N.W.2d 346, 352 (Minn.1981); *Ruberg v. Skelly Oil Company,* 297 N.W.2d 746, 751–52 (Minn. 1980).

We find the above-cited Wisconsin and Minnesota case law persuasive. In light of the North Dakota Legislature's retention of the doctrine of joint and several liability under Section 9–10–07, it is evident the trial court's reduction of Layman's recoverable damages against BMA by the percentage of Minn-Dak's negligence was inappropriate. The interrelationship between our workmen's compensation statutes and our comparative negligence act

---

**10.** The court in *Wisconsin Nat'l Gas, supra,* also rejected the appellant's argument that the court should change the Wisconsin comparative negligence statute so that the negligence of the plaintiff would be compared to the combined negligence of all defendants rather than compared to the individual negligence of each defendant.

The court held that any modification of the comparative negligence statute "is best left to the legislature as they can conduct a full fact-finding hearing where a more thorough discussion of the subject can only lead to greater knowledge and expertise in the ever challenging area of tort law." 291 N.W.2d at 831–33.

does not compel the result reached by the trial court here.

In *Tucker v. Union Oil Company of California*, 100 Idaho 590, 603 P.2d 156 (1979), an employee injured in an industrial accident for which he received workmen's compensation benefits brought a personal injury action against a third-party tort-feasor. The jury apportioned the negligence for the employee's injuries as follows: third-party tort-feasor, 60%, employer, 30%, and employee, 10%. The third-party tort-feasor asserted the trial court erred in entering judgment against it in an amount representing 90% of the jury's assessment of damages rather than in an amount commensurate to its proportionate share of fault. The Idaho Supreme Court initially emphasized language in the state's comparative negligence statute, allowing damages to be reduced in the proportion to the amount of negligence attributable to the person recovering, and determined the result sought by the third-party tort-feasor would effectively attribute the negligence of the employer to the injured employee. The court deemed it clear that such a result would undermine the fundamental rationale of joint and several liability as retained by the state's comparative negligence statute. This conclusion was based, in part, on the following language from *American Motorcycle Ass'n v. Superior Court*, 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899 (1978), wherein the Supreme Court of California held that that state's adoption of comparative negligence did not require that a concurrent tort-feasor be held liable only on the basis of its comparative fault:

> " 'Under well-established common law principles, a negligent tortfeasor is generally liable for all damage of which his negligence is a proximate cause; stated another way, in order to recover damages sustained as a result of an indivisible injury, a plaintiff is not required to prove that a tortfeasor's conduct was the sole proximate cause of the injury, but only that

such negligence was a proximate cause.

\* \* \* \* \* \*

> " 'In the concurrent tortfeasor context, however, the "joint and several liability" label does not express the imposition of any form of vicarious liability, but instead simply embodies the general common law principle, noted above, that a tortfeasor is liable for any injury of which his negligence is a proximate cause. Liability attaches to a concurrent tortfeasor in this situation not because he is responsible for the acts of other independent tortfeasors who may also have caused the injury, but because he is responsible for all damage of which his own negligence was a proximate cause. When independent negligent actions of a number of tortfeasors are each a proximate cause of a single injury, each tortfeasor is thus personally liable for the damage sustained, and the injured person may sue one or all of the tortfeasors to obtain a recovery for his injuries; *the fact that one of the tortfeasors is impecunious or otherwise immune from suit does not relieve another tortfeasor of his liability for damage which he himself has proximately caused.*' (Emphasis supplied.) 146 Cal.Rptr. at 187, 578 P.2d at 904. "*See also Arbaugh v. Procter & Gamble Mfg. Co.*, 80 Cal.App.3d 500, 145 Cal. Rptr. 608 (1978), and *Seattle First Nat'l Bank v. Shoreline Concrete*, 91 Wash.2d 230, 588 P.2d 1308 (1978)." 603 P.2d at 165–66.

The Idaho Supreme Court rejected the third-party tort-feasor's argument that the limitation of its liability to its proportionate fault was uniquely justified because the employer was immunized from tort liability by the workmen's compensation law. The court said:

> "It is apparent in the cases discussed above that underlying the rejection of limiting damages to proportionate fault is the retention of the concept that each tortfeasor whose negligence is a proximate cause of an indivisible injury should remain individually liable for *all* compen-

sable damages attributable to that injury. Such is the underlying basis for the rule of joint and several liability.

\*    \*    \*    \*    \*    \*

"... As stated in *Seattle First National Bank v. Shoreline Concrete, supra:*

'Joint and several liability is premised upon causation and indivisibility of the *harm* caused. The simple feasibility of apportioning *fault* on a comparative negligence basis, between plaintiff and defendant, does not render an indivisible injury "divisible" for purposes of joint and several liability. That it may be possible to assign a percentage figure to the relative culpability of multiple tort-feasors does not detract from the preliminary fact that *each* tort-feasor's conduct was a proximate cause of an indivisible injury.' 588 P.2d at 1313.

*See also American Motorcycle Ass'n v. Superior Court, Supra.*

"As to one of multiple tortfeasors being immunized from liability, the Restatement (Second) of Torts, § 880 states: '*Where one of two tortfeasors has immunity.*—Where two persons would otherwise be liable for a harm, one of them is not relieved from liability by the fact that the other has an absolute privilege to act or an immunity from liability to the person harmed.' " 603 P.2d at 166.

The Idaho court also determined, as Layman asserts here, that limiting the third-party tort-feasor's liability to its proportionate share of fault merely shifts any inequity from the third-party tort-feasor to the plaintiff employee. The court determined that the interrelationship between the workmen's compensation and comparative negligence statutes of the state did not compel the result sought by the third-party tort-feasor, and concluded that if such a result was to be obtained, it was a matter best left to the legislative process.

We agree with the view expressed that a reduction of a plaintiff's damage recovery in such circumstances by an amount commensurate to the proportionate share of fault of an employer would undermine the doctrine of joint and several liability.

BMA contends that "as in *Bartels v. City of Williston,* 276 N.W.2d 113 (N.D. 1979), the unfairness and inequity of imposing liability on one of two tort-feasors by applying a statute that provides for joint and several liability, but which makes no provision for any right to contribution ... makes it necessary for this Court to intervene and reconcile the legal principles and public policies."

In *Bartels, supra,* the plaintiff was seriously injured when a vehicle in which he was a passenger went over a cliff on property under lease to the City of Williston. The plaintiff settled with the driver and his insurer, gave them a release, and, thereafter, brought an action in United States District Court against the City of Williston. The city then brought a third-party action against the released driver who, thereafter, moved for summary judgment, seeking to have the third-party complaint against him dismissed. Through questions certified to this Court by the United States District Court, we reconciled conflicting provisions of Chapter 32–38 and Section 9–10–07.[11] We determined in *Bartels, supra,* that the

---

11. Section 32–38–02(1), N.D.C.C., provided:

> "In determining the pro rata shares of tort-feasors in the entire liability:
> 1. Their relative degrees of fault shall not be considered."

Section 32–38–02(1) conflicted with Section 9–10–07, which provides: "When there are two or more persons who are jointly liable, contributions to awards shall be in proportion to the percentage of negligence attributable to each." Also in conflict with Section 9–10–07 was Section 32–38–04(1), N.D.C.C., which provided:

> "When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
> 1. It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater."

language in Section 9–10–07, N.D.C.C., "provided, however, that each shall remain jointly and severally liable for the whole award," is for the benefit of the injured party and can be waived. We concluded that the general release given the driver by the plaintiff constituted a general release for all of the driver's liabilities which excluded him as a party from any further action against any of the remaining non-settling tort-feasors. We determined the general release constituted a waiver by the plaintiff of the joint and several liability provisions of Section 9–10–07, and thus also concluded the plaintiff's recovery from the non-settling tort-feasors was limited to the percentage of negligence attributable to the remaining non-settling tort-feasors.

In answering the questions certified to this Court in *Bartels, supra,* however, we were careful to point out:

"While some of the answers to the certified questions may have general application, we must nevertheless caution that they were predicated upon the facts of this case, particularly the general release given to one of the alleged tort-feasors. The absence of a general release or a different set of facts conceivably could produce different answers." 276 N.W.2d at 123.

We do not believe *Bartels, supra,* constitutes precedence for amending, by judicial fiat, Section 9–10–07 so as to eliminate the concept of joint and several liability in a case involving a negligent third-party tort-feasor and an employer immune from suit because of the exclusive remedy provisions of the workmen's compensation statutes. *Bartels, supra,* involved a genuine conflict between provisions of Chapter 32–38 and Section 9–10–07, N.D.C.C. As our previous decisions have indicated, a third-party tort-feasor has no statutory "right" to contribution from a negligent employer immune from suit by operation of the exclusive remedy provisions of the workmen's compensation statutes. We conclude that any changes in the comparative negligence act or the exclusive remedy provisions and subrogation provisions of the workmen's com-

pensation statutes are matters best left to our legislature. *See Gernand v. Ost Services, Inc., supra; Sayler v. Holstrom, supra.*

The trial court's reduction of Layman's damage recovery against BMA by the percentage of negligence attributable to Minn-Dak is contrary to the express language of Section 9–10–07, which retains the doctrine of joint and several liability. Therefore, we reverse the judgment of the trial court insofar as it awards Layman damages commensurate only to the negligence attributable to BMA.

For the reasons stated in this opinion, we affirm the judgment in part, reverse the judgment in part, and remand this case for modification pursuant to this opinion.

PEDERSON and GIERKE, JJ., concur.

PEDERSON, Justice, concurring specially.

I agree with the opinion authored by Chief Justice Erickstad. He has done a commendable job in analyzing the facts and the law and in justifying the results. Likewise, the trial court performed admirably in the trial of the case and understanding the complexity of the applicable law, as reflected in the findings of fact and conclusions of law.

The trial court prepared 44 numbered findings of fact, several with subdivisions with up to 12 separately numbered paragraphs. As far as I can determine, no one urged that he adopt more, or less, or different findings of fact. Yet it is apparent that a critical finding "that the negligence of Minn-Dak should have been forseen by BMA" was overlooked. (See slip opinion by Chief Justice Erickstad, pages 18–19.)

Judicial economy prevents me from urging that the case be remanded to permit the trial court to make the necessary finding. At the same time, I am compelled to point out that when appellate judges make findings of fact they encroach on the trial court function. Since *Nichols & Shepard Co. v. Stangler,* 7 N.D. 102, 72 N.W. 1089, 1090 (1897) this court has been reiterating

that our system has "discarded all implied findings," even before trial de novo on appeal was abolished.

VANDE WALLE, Justice, concurring specially.

It is apparent to me that the resolution of Layman's appeal creates inequities regardless of the solution adopted. I much prefer the alternative solution referred to in Justice Sand's opinion, i.e., the denial of subrogation under Section 65–01–09, N.D. C.C., and the reduction of the judgment pursuant to Section 32–38–04(2), N.D.C.C. That solution was discussed by this court in *Sayler v. Holstrom*, 239 N.W.2d 276 (N.D. 1976), but rejected therein for the reason it is one that should be submitted to the Legislature for its consideration. Although that opinion was issued in 1976 and the Legislature has convened in four regular sessions since that time, there has been no legislative resolution of the problems created by the statutes under consideration in this case.

Perhaps this court should reconsider its decision in *Sayler* and conclude that in those instances in which an employer's negligence, with that of a third party, concurrently contributed to the injury of an employee, the Workmen's Compensation Bureau is not entitled to reimbursement for benefits paid to the employee who has recovered sums for his injuries from the third party. This is apparently what the Idaho Supreme Court concluded in *Liberty Mutual Insurance Company v. Adams*, 91 Idaho 151, 417 P.2d 417 (1966).

Neither the Bureau nor the employer, Minn-Dak, are parties to this action and it would be unjust to adopt such a resolution without the opportunity for those parties to participate in the case. Because it appears to me that a resolution which does not penalize an employee who is injured through no negligence of his own is a more just resolution than one which would result in reducing the liability of a negligent third party at the expense of an innocent employee, I reluctantly concur in the result reached in the majority opinion. Perhaps the solution reached in the majority opinion will serve as the catalyst for a legislative solution of this problem more rapidly than will the solution proffered in the opinion authored by Justice Sand.

GIERKE, Justice (specially concurring).

I agree with the opinion authored by Chief Justice Erickstad. I would, however, like to make some additional observations with regard to the case of *Tucker v. Union Oil Co. of California*, 100 Idaho 590, 603 P.2d 156 (1979), referred to in both the opinion of the Chief Justice and the opinion of Justice Sand. In *Tucker, supra* 603 P.2d at 169, the Idaho Supreme Court stated, in pertinent part:

"I.C. § 72–223 provides that an employer may be subrogated to the rights of the employee to the extent that the employee has received compensation benefits. In *Liberty Mutual Ins. Co. v. Adams*, 91 Idaho 151, 417 P.2d 417 (1966), however, the right of an employer to such subrogation and its ability to obtain reimbursement from the employee was limited. The Court held that when an employer's negligence, together with the negligence of a third party nonemployer tortfeasor, concurrently contributed to the injury of an employee, neither the employer not [*sic*] his surety may obtain reimbursement for workmen's compensation benefits from an employee who recovers from a third party tortfeasor."

The court further stated, *id.* 603 P.2d at 171:

"We hold that the jury instruction here does not adequately safeguard against a double recovery to the Tuckers."

It appears clear to me that the reasoning in the *Tucker* case was founded on the desire of the court to prevent a double recovery on the part of the employee. As stated above, under the facts of the Tucker case the rights of subrogation of the insurer were lost and, accordingly, Tucker was in a position to retain his workmen's compensation benefits and the full recovery as well. In the instant case, the Workmen's Com-

pensation Bureau is entitled to recover the benefits paid to Layman pursuant to § 65–01–09, N.D.C.C., regardless of the finding of 75 percent negligence on the part of the employer. To further reduce the award of damages by that amount would result in shifting any inequity from the third party tortfeasor, BMA in this case, to the plaintiff-employee, Layman.

The holding in the *Tucker* case, *supra*, serves to prevent the employee from receiving a double payment. I suggest that the opinion of Justice Sand, if followed by this court, would result in just the opposite. It would, in essence, result in the plaintiff-employee having the amount of the workmen's compensation benefits subtracted from his award twice.

The second solution proposed by Justice Sand would be the denial of the Workmen's Compensation Bureau's subrogation rights under § 65–01–09, N.D.C.C., thus requiring an employer, "over a period of time, to pay a premium on the employment classifications equal, or nearly equal, to the benefits paid to the employee". I agree with Justice Sand that this solution might produce the most equitable result under the facts of this case. Section 65–01–09, N.D.C.C., states in pertinent part "The bureau's subrogation interest may not be reduced by settlement, compromise, or judgment". In light of this statutory language, I believe that such a denial of subrogation rights must be left to the Legislature.

I recognize that it is Justice Sand's position that the opinion of Chief Justice Erickstad, in effect, disregards the provisions of § 32–38–04(2), N.D.C.C. I cannot agree with Justice Sand's position as I do not equate the giving of a voluntary release, as in the *Bartels* case, with the statutory provisions of § 65–01–08, N.D.C.C.

SAND, Justice, concurring specially and dissenting.

I agree with many of the legal principles discussed and followed in the Erickstad opinion but I have reservations regarding the manner in which the conclusion was reached. The opinion states, "We conclude that any changes in the comparative negligence act or the exclusive remedy provisions and subrogation provision of the workmen's compensation statutes are matters best left to our legislature," citing *Gernand v. Ost Services, Inc.*, 298 N.W.2d 500 (N.D.1980) and *Sayler v. Holstrom*, 239 N.W.2d 276 (N.D.1976). Nevertheless, the opinion disregards, as if repealed, pertinent provisions of North Dakota Century Code Ch. 32–38, particularly § 32–38–04 which was discussed and modified in *Bartels v. City of Williston*, 276 N.W.2d 113 (N.D.1979), but limited to the facts in that case. Furthermore, the opinion endorses the principles set forth in *Tucker v. Union Oil Company of California*, 100 Idaho 590, 603 P.2d 156 (1979), but then disregards a major holding that the "third-party tortfeasor was entitled to have judgment against it reduced by the amount of Workmen's Compensation benefits paid to plaintiff." The Idaho workmen's compensation act on the features involved here are substantially similar to the North Dakota Workmen's Compensation Act. The *Tucker* case gave full recognition to the legal principles stated in NDCC § 32–38–04(2) stating:

"When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort to the same injury or the same wrongful death:

1. It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater.

2. It discharges the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor."

This provision and the corresponding holding of the *Tucker* court was disregarded.

By following the rationale that any modification or change must come from the

legislature, which implies that we accept the statutes and give each full force and effect, the following pari materia statutes must be considered, applied, and reconciled if the need exists.

NDCC § 32–38–04, stated above.

NDCC § 9–10–07, comparative negligence, provides if two or more persons who are jointly liable, "contributions to awards shall be proportioned to percentage of negligence attributable to each; provided, however, that each shall remain severally and jointly liable for the whole award."

NDCC § 65–01–08 provides that a contributing employer shall not be subject to any action brought by the employee. The employee must look solely to the Fund for compensation. It provides, basically, that the contributing employer is protected from any actions against him by any employee and that the employee must look solely to the Fund for compensation. The contributing employer may not be named a third-party defendant. Neither may a joint tortfeasor recover from the employer. This is also referred to as the exclusive remedy. See *Stine v. Weiner*, 238 N.W.2d 918 (N.D.1976); *White v. McKenzie Electric Coop, Inc.*, 225 F.Supp. 940 (1964); and *Gernand v. Ost Services, Inc.*, 298 N.W.2d 500 (N.D.1980).

NDCC § 65–01–09 provides that in a third-party action the Bureau is subrogated to any monies recovered by the claimant (injured employee) from the third party.

In reconciling statutory provisions, we give appropriate consideration to the basic principles stated in NDCC Ch. 1–02.

In addition to NDCC § 32–38–04(2), set out above, § 32–08–01(2) and (5) may have application and may have to be reconciled with § 9–10–07, if they cannot be harmonized. Without going into detail, they can be reconciled without disregarding their basic concepts. Just as NDCC § 65–01–08 and § 65–01–09 must be, and can be, reconciled with § 9–10–07. So can §§ 32–38–01(2), (5), and 32–38–04(2) be reconciled with NDCC § 9–10–07.

The Bureau, under its subrogation rights, as a matter of equitable principle, should share in the attorney's fees which are not included or recovered in the judgment. The attorney's fees customarily allowed in a tried case are one-third of the amount recovered. Thus the Bureau should reduce its subrogation in the amount equivalent to the attorney's fees, or, in the alternative, pay its share of the attorney's fees.

The employer in this case, by applying NDCC § 65–01–08 in effect became a released tortfeasor under NDCC § 32–38–04(1) and (2) by operation of law. In *Bartels* we modified the language in subsection (1) because of the possibility of manipulating a release from one at the expense of the other tortfeasors, but in this case the release is by operation of law rather than by the injured party, which eliminates the possibility of manipulation.

Applying the foregoing statutory provisions to the instant case, where the contributing employer was found 75% negligent and the other tortfeasor 25%, produces the following:

Total recovery is $71,851.37, reduced by $18,779.74, the amount the injured employee received from the Bureau representing the "consideration paid" or "amount stipulated" for the release (NDCC § 65–01–08 and § 32–38–04) which leaves $53,071.63. The Bureau, pursuant to NDCC § 65–01–09 is subrogated in the amount of $18,779.74, less attorney's fees which generally are in the neighborhood of one-third when the case is tried, amounting to $6,259.91, reducing the Bureau's subrogation to $12,591.83. This would leave a complete recovery to claimant in the amount of $40,550.80. The employee, however, would have to pay the agreed-upon attorney's fees.

I am not unsympathetic toward the employee and recognize that this results in some inequities. The irony is that the contributing employer, who was 75% negligent even though, according to some authorities, cannot be treated as a joint tortfeasor, receives the greatest protection, or benefit, at the expense of the other tortfeasor or tortfeasors. In fact, such employer does

not even suffer a rate increase in premiums.

In *Bartels* we observed that NDCC § 9–10–07 was enacted to overcome the grave inequity of prohibiting or preventing a recovery if the plaintiff was 1% negligent. However, technically now a joint tortfeasor only 1% negligent can become 100% liable for the full amount of the judgment because the other tortfeasor or tortfeasors are either protected by law or judgment-proof. This raises some interesting constitutional questions which have not been raised, and consequently were not implicitly considered or put to rest.

A further inequity exists. The compensation benefits for injuries do not cover pain and suffering, whereas a tort action recovery for damages includes pain and suffering. To make appropriate adjustments on subrogation matters the trier of fact, jury or judge, would have to make special findings or render special verdicts, specifying the damages separately from pain and suffering. Any subrogation would be limited to the recovery for damages but not for pain and suffering. However, some may argue that any claimant-employee receiving a definite benefit regardless of fault should not be entitled to have any recovery for pain and suffering excluded from the subrogation provision.

A problem also exists by the release of one joint tortfeasor, whether by voluntary action by the plaintiff or by operation of law can, because this will frequently produce a tendency to put the blame—negligence—fault on the party that has settled or has been released who, in this instance is the contributing employer under the Workmen's Compensation Act. As between joint tortfeasors, the end result under NDCC § 9–10–07 would be the same except the joint tortfeasor has no recourse against a contributing employer, but because additional evidence may be submitted or prosecuted more effectively, the difference between the plaintiff's negligence and the joint tortfeasor may be affected. See my concurring opinion in *Schwartz v. Ghaly*, 318 N.W.2d 294, 392 (N.D.1982). No

one really represented the employer in this case, yet the negligence of the employer must be borne by the other tortfeasor.

These are only the apparent inequities resulting from the current statutes. I am aware that the Forty-seventh Legislative Assembly had under consideration Senate Bill 2340 which was a product of the Legislative Judiciary "A" Committee. This Bill rewrote NDCC § 9–10–07, but was amended by the Senate and then defeated. The Bill, as amended by the Senate, would have deleted the following language in § 9–10–07: "provided, however, that each shall remain jointly and severally liable for the whole award." A similar Bill was defeated the next year. But without the given reason this is not of much value according to *St. Vincent's Nursing Home v. Department of Labor*, 169 N.W.2d 456 (N.D.1969), which held that an attempted amendment does not indicate legislative intent of statutes sought to be amended. A contributing employer, by statutory construction, is excluded from NDCC § 9–10–07 as a liable tortfeasor by reason of the provisions of NDCC § 65–01–08. Other inequities can also be resolved by statutory construction.

These inequities are mentioned so that if the Legislature is so inclined appropriate changes can be made. We, as a Court, have applied some modifications by statutory construction and probably will continue to do so.

We have held that where the trial court applied inappropriate law the findings of fact are also improper. *Diemart v. Johnson*, 299 N.W.2d 546 (N.D.1980). The trial judge apparently relied upon *Bartels*, which had limited application. I do not know for certain if the findings of fact as to percentage of negligence of each party involved would remain the same. Nevertheless, under the circumstances of this case I would not eliminate a remand for a new trial with directions regarding the appropriate laws to be applied. I am aware that judicial economy is a matter which should be considered, yet it should not be the deciding factor in promoting justice.

Another solution I could support would be to deny the subrogation under NDCC § 65–01–09 and reduce the judgment in accordance with NDCC § 32–38–04(2). *Liberty Mutual Ins. Co. v. Adams,* 91 Idaho 151, 417 P.2d 417; 82 Am.Jur.2d *Workmen's Compensation* § 437, p. 204. This would require the employer, over a period of time, to pay a premium on the employment classifications equal, or nearly equal, to the benefits paid to the employee. This would bring about the most equitable solution under the circumstances of this case. In my opinion, equal or more justification exists proceeding in this manner than to ignore the provisions of NDCC § 32–38–04(2).

Justice Gierke's opinion states that he does not equate the *Bartels* case with NDCC § 65–01–08. Neither do I. My opinion in substance states that NDCC § 32–38–04(2) should be applied as it reads without the modification placed upon that section in *Bartels.* In my opinion, a release is a release whether it is voluntary or by operation of law.

The *Tucker* case, in addition to the part quoted in Justice Gierke's opinion, also states:

> "We find the rationale of *Associated* to be persuasive. The defendant-appellant Collier Carbon is entitled to have the judgment against it reduced by the amount of workmen's compensation benefits paid to Tucker. As to that portion of the *Associated* decision relating to the right of the employer to be subrogated to a portion or all of the workmen's compensation benefits dependent upon the extent to which negligence has been assessed against the employer, we find such to be unnecessary to our decision today.[3] [Footnote omitted.]

> . . . . .

> "We hold that the jury instruction here does not adequately safeguard against a double recovery to the Tuckers. Therefore, we remand this case to the trial court solely for a reduction of the judgment by the amount of the workmen's compensation benefits received by Tuck-

er. Since that said instruction was erroneous, the Tuckers may decline to accept that reduction in the judgment, and in that event, the district court is directed to grant a new trial solely on the issues of damages." 603 P.2d 156 at 170–171.

This clearly indicates that the subrogation provision was not settled in the *Tucker* case.